NATURAL RESOURCES DEFENSE
COUNCIL, INC.

v.

Russell E. TRAIN, in his official capacity as administrator, environmental protection agency, et al., Appellants.

No. 74–1433.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 24, 1974.

Decided Dec. 5, 1974.

As Modified Mar. 10, 1975.

Lawrence E. Shearer, Atty., Dept. of Justice, Washington, D. C., with whom Carl Strass, Atty., Dept. of Justice, Washington, D. C., was on the brief, for appellants. Wallace H. Johnson, Asst. Atty. Gen., also entered an appearance for appellants.

Edward L. Strohbehn, Jr., Washington, D. C., with whom J. G. Speth, Washington, D. C., was on the brief, for appellee.

Before LEVENTHAL and ROBB, Circuit Judges, and NICHOLS,* Judge, United States Court of Claims.

LEVENTHAL, Circuit Judge:

The Natural Resources Defense Council (NRDC) brought an action in federal district court against the Environmental Protection Agency (EPA) and its Administrator (then Robert W. Fri, now Russell E. Train), seeking to compel the publication of effluent limitation guidelines called for by section 304(b)(1)(A) of the Federal Water Pollution Control Act Amendments of 1972.[1] This appeal from the District Court's orders of November 15 and 27, 1973, granting relief sought by NRDC[2] presents questions pertaining to the duty imposed upon the Administrator by that section and the operation of the citizen suits provisions of the Act. (Pertinent provisions of the Act are gathered in Appendix A.)

The Act, enacted on October 18, 1972, after extensive consideration and debate, establishes a comprehensive program designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" in pursuit of a "national goal that the discharge of pollutants into the navigable waters be eliminated by 1985."[3] Although the statute launches a multipronged attack on the problem of water pollution,[4] it relies primarily on a permit program for the achievement of effluent limitations— restrictions on the quantity of pollutants that may be discharged into the nation's waters—to attain its goals.

A brief sketch of the provisions of the Act relating to the formulation and implementation of the effluent limitations will indicate the relationship of the par-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. 33 U.S.C. § 1314(b)(1)(A) (Supp. II 1972).

2. 6 ERC 1033 (D.D.C.1973).

3. Section 101(a)(1) of the Act; 33 U.S.C. § 1251(a)(1) (Supp. II 1972).

4. In addition to the effluent limitations in section 301(b), the Act employs measures including national performance standards for new sources (section 306), standards for toxic pollutants (section 307), pretreatment standards for publicly owned treatment works (section 307) and water quality standards (section 302). See id. §§ 1311(b), 1312, 1316, 1317.

ticular subsection at issue to the working of the Act. Section 301(b) sets forth two stages of effluent limitations which are to be achieved as intermediate steps in pursuit of the 1985 objective. The first step requires conformity not later than July 1, 1977, with effluent limitations for point sources other than publicly owned treatment works that shall require the application of the best practicable control technology currently available.[5] The second stage, to be completed no later than July 1, 1983, contemplates the reduction of the discharge of pollutants to an effluent limitation level attainable by the application of the best available technology economically achievable for such classes and categories of point sources.[6]

A primary means created by the Act for achieving the effluent limitations by the deadlines contained in section 301(b) is the National Pollutant Discharge Elimination System (NPDES) established by section 402.[7] After dates set forth in that section, a person must obtain a permit and comply with its terms in order to discharge any pollutant.[8] The conditions of the permit must assure that any discharge complies with the applicable requirements of numerous sections including the effluent limitations of section 301(b).[9]

The timetable for permit issuance is set forth in section 402(k). For the first 180 days after the enactment of the statute, the discharge of any pollutant shall not be a violation of the Act if the discharger applies for a permit within the 180 day period. Until December 31, 1974, the pendency of an application for a permit containing the necessary information for processing of the application will prevent a polluter from being in violation of the permit requirement.[10] After December 31, 1974, the Act contemplates that all discharges from point sources shall be made in conformity with a permit. The permits may be issued by the states under approved programs or by the Administrator in the absence of a state program.[11] The Act vests the Administrator with final review authority for permits issued by the states.[12]

The effluent limitations incorporated in the permit conditions are to be based on regulations published under section 304(b) providing guidelines "[f]or the purpose of adopting or revising effluent limitations."[13] Subsection (1) of that provision deals with guidelines for the effluent limitations to be achieved by July 1, 1977, limitations based on use of the best practicable control technology currently available. The provision involved in this appeal, section 304(b)(1)(A), requires the identification of the "degree of effluent reduction attainable through the application" of that technology to classes and categories of point sources "in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants." The companion provision, section 304(b)(1)(B), calls on the Administrator to set forth factors for determining the

---

5. *Id.* § 1311(b)(1).

6. *Id.* § 1311(b)(2).

7. *Id.* § 1342.

8. Section 301(a) provides that "the discharge of any pollutant by any person shall be unlawful" unless in compliance with sections 301, 302, 306, 307, 318, 402, and 404 of the Act. *Id.* § 1311(a). As a result, compliance with the permit program is a prerequisite to lawful discharge of pollutants. The timetable for the permit program is contained in section 402(k). *Id.* § 1342(k).

9. *See* section 402(a)(1), (b)(1)(A); 33 U.S.C. § 1342(a)(1), (b)(1)(A) (Supp. II 1972). The regulations under section 402 require that each "NPDES permit apply and insure compliance with . . . [e]ffluent limitations under sections 301 and 302 of the Act." 40 C.F.R. § 124.42(a)(1) (1973). Section 402(a)(1) contains a safety valve which allows the Administrator to issue permits on "such conditions as [he] determines are necessary to carry out the provision of the Act" prior to "necessary implementing actions" relating to the requirements of sections including section 301. 33 U.S.C. § 1342(a)(1) (Supp. II 1972); *see* 40 C.F.R. § 124.42(a)(6) (1973).

10. *See* 33 U.S.C. § 1342(k) (Supp. II 1972).

11. *See id.* §§ 1342(a), (b).

12. *See id.* § 1342(d). *See* note 96 and accompanying text *infra.*

13. *Id.* § 1314(b).

control measures and practices to be applied to point sources.

The primary question in this case is the interpretation of the time limit imposed for the publication of regulations under section 304(b)(1)(A). The section states in pertinent part:

> (b) [T]he Administrator shall . . . publish within one year of enactment of this title, regulations, providing guidelines for effluent limitations and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall—
>
> (1)(A) identify . . . the degree of effluent reduction attainable . . . for classes and categories of point sources (other than publicly owned treatment works). . . .

NRDC claims that the regulations for all classes and categories of point sources were due on October 18, 1973, "in order to provide time to apply these guidelines to all point sources through the permits which must be issued by December 31, 1974."[14] EPA argues that section 304 must be administered in the light of section 306. Section 306(b)(1)(A) provides that the Administrator shall publish, within 90 days after the October 18, 1972, date of enactment, and from time to time thereafter shall revise, a list of categories and sources. It specifies that the list "shall, at the minimum, include: pulp and paper mills; * * * timber products processing." This minimum list consists of 27 specified sources. EPA's position is that guidelines for categories of sources specified in section 306(b)(1)(A) were required by October 18, 1973, but that the agency has discretion regarding the publication date of regulations for other point source categories.[15]

The circumstances which culminated in the filing of the present action by NRDC relate back to public meetings held in early 1973 at which EPA officials discussed the agency's plans for implementing section 304(b)(1)(A).[16] Those plans called for the publication of guidelines in three groups in October, 1973, May, 1974, and October, 1974.[17] On April 12, 1973, J. G. Speth, counsel for NRDC, wrote Robert McManus, Office of General Counsel, EPA, to protest the "plainly illegal course" embodied in the implementation plans.[18] The letter set forth NRDC's understanding of EPA's position and argued that the Act required publication of all section 304(b)(1)(A) guidelines by October 18, 1973. Robert V. Zener, Acting Deputy General Counsel of EPA, responded on June 15, 1973, reaffirming the agency's position and claiming that it was supported by the language and the legislative history of the provision.[19]

On August 14, 1973, NRDC filed a complaint in the United States District Court for the District of Columbia seeking a declaration that the Administrator had a nondiscretionary duty under section 304(b)(1)(A) to promulgate effluent limitation guidelines for all classes and categories of point sources (other than publicly owned treatment works) within one year of the enactment of the Act and an order requiring that such guidelines be promulgated as expeditiously as possible and in no event later than April 1, 1974.[20] On November 15, 1973, Judge Green granted plaintiff's motion for summary judgment, declaring that the "defendants have a mandatory, non-discretionary duty to publish within one year of enactment of the Act final Section 304(b)(1)(A) effluent limitation guidelines necessary to provide comprehensive coverage of all point source discharges" and ordering a proposed schedule for publication of guidelines with a final deadline of October 1, 1974.[21] A subsequent order, issued November 27,

---

**14.** Brief for Appellee at 13.

**15.** Brief for Federal Appellants at 12–18.

**16.** *See* Letter from J. G. Speth, counsel for NRDC, to Robert McManus, Office of Gen. Counsel, EPA, April 12, 1973, at 2; App. 60.

**17.** *See* Brief for Appellee at 15; Letter from Robert V. Zener, Acting Deputy Gen. Counsel, EPA, to J. G. Speth, NRDC, June 15, 1973, at 1; App. 62.

**18.** Letter, note 16 *supra*, at 2; App. 60.

**19.** Letter, note 17, *supra*, at 1–3; App. 62–64.

**20.** App. 27, 42–43.

**21.** 6 ERC 1033 (D.D.C.1973).

1973, enjoined the defendants to comply with a detailed timetable for publication of guidelines that divided point sources into two groups—Group I, corresponding to the 27 categories of sources listed in section 306(b)(1)(A), and Group II, including all other classes and categories of point sources.[22] That order allocated the categories contained in the two groups among 29 publication dates beginning on January 15, 1974, and ending on November 29, 1974. Guidelines for all Group I categories were due on October 1, 1974, with publication of Group II guidelines to commence on October 4, 1974.[23] The trial court established this timetable "[t]o ensure that Section 304(b)(1)(A) guidelines will be published in time to be applied meaningfully in the National Pollutant Discharge Elimination System (NPDES) permit program established by Section 402 of the Act."[24]

EPA's motions for a stay of the District Court's order pending appeal were denied by the District Court on May 16, 1974, and by this court on July 25, 1974. At oral argument on appeal the agency again moved for a stay of the order entered below and NRDC voiced its objections to this motion. On October 3, we granted appellants' motion, in part, staying the District Court's order pertaining to Group II categories and requiring that section 304(b)(1)(A) guidelines for those categories be published by December 31, 1974.[25]

The memorandum accompanying the stay order sketched our tentative thinking on the two issues raised by EPA—(1) whether the District Court lacked subject matter jurisdiction because NRDC failed to give 60 days notice prior to commencement of the action and (2) whether the District Court erred in finding that the Administrator had a nondiscretionary duty to publish all section 304(b)(1)(A) effluent limitation guidelines by October 18, 1973. Our present thinking reflects the reconsideration of the issues prompted by the process of drafting and revision and assisted by supplemental briefs filed by both parties. The opinion departs from the approach but not the conclusion reached on the jurisdictional issue and fills out, with some modifications, the memorandum's discussion of the merits.

## I. JURISDICTION

■ The Government contends that the District Court lacked subject matter jurisdiction in this case, and consequently, that its order must be vacated. The Administrator argues that an action brought by a citizen to compel him to perform a duty which is not discretionary under the Act must be commenced under section 505(a)(2),[26] and that section 505(b)(2) precludes an action under subsection (a)(2) "prior to sixty days after plaintiff has given notice of such action to the Administrator."[27] Pursuant to

**22.** 6 ERC 1033, 1034–36 (D.D.C.1973).

**23.** *Id.*

**24.** *Id.* at 1033–34.

**25.** Memorandum, Oct. 3, 1973, at 5.

**26.** 33 U.S.C. § 1365(a)(2) (Supp. II 1972).

§ 1365. Citizen suits—Authorization; jurisdiction

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

\* \* \* \* \* \*

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy

or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

**27.** *See* Brief for Federal Appellants at 6–11. Section 505(b)(2), 33 U.S.C. 1365(b)(2) (Supp. II 1972) states:

(b) No action may be commenced—

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

the directive of subsection (b)(2), the Administrator has prescribed regulations governing the manner of affording notice.[28] EPA urges, for the first time on appeal, that NRDC's failure to comply with the notice regulations constitutes a fatal jurisdictional defect.[29] If this is a jurisdictional defect, it may be raised on appeal either by the parties or by the court *sua sponte*.[30]

NRDC claims that section 505(e) of the Act[31] allows this action to be brought under either the general federal question statute, 28 U.S.C. § 1331, or the Administrative Procedure Act without prior notice to the Administrator.[32] We accept this view.[33]

### A.

*Citizen Suit Provisions*

■ The issue is the intention of the "citizens suits" provision of section 505, and the relationship between its subsections (a), (b), and (e). Section 505(a)(2) plainly provides for actions, like the present one, to require the Administrator to perform a nondiscretionary duty specified by the Act, but NRDC argues that it is not exclusive. NRDC relies on section 505(e) as a saving clause that preserves jurisdiction granted by other statutes, in addition to the jurisdiction conferred by section 505(a). The question of the exclusivity of section 505(a)(2) simply cannot be resolved by looking at the plain language of the Act. We therefore turn to legislative history.

The citizen suits provision of section 505 was explicitly "modeled on the provision enacted in the Clean Air Amendments of 1970."[34] (For convenience, the pertinent section of that statute and the key elements of its legislative history are set forth in Appendix B of this opinion.) The citizens suits provision that emerged as section 304 of the Clean Air Act originated in the Senate to "provide citizen participation in the enforcement of standards and regulations established under this Act."[35] It reflects Congress's

**28.** *See id.* § 1365(b) ("Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation."); 40 C.F.R. § 135 (1973).

**29.** The agency did not present any jurisdictional objections during the proceedings in the District Court or in its application for stay pending appeal. *See* Brief for Appellee at 22 & n. 68; App. 87–89.

**30.** *See, e. g.*, Mansfield, Coldwater & Lake Mich. Ry. v. Swan, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed.2d 462 (1884); H. Hart & H. Wechsler, The Federal Courts and the Federal System 835–36 (2d ed. P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler (1973)); C. Wright, The Law of Federal Courts § 8, at 15–16 (2d ed. 1970). Questions concerning subject matter jurisdiction may only be raised on direct review. *See, e. g.*, Chicot Co. Dist. v. Baxter State Bank, 308 U.S. 371, 376–377, 60 S.Ct. 317, 84 L.Ed. 329 (1940).

**31.** 33 U.S.C. § 1365(e) (Supp. II 1972).

(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

**32.** *See* Brief for Appellee at 22–25. NRDC also claimed jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (1970), and the Mandamus and Venue Act, 28 U.S.C. § 1361 (1970). *See Complaint* at 3, App. 29. In addition NRDC argued that its letter of April 12, 1973, to an attorney in EPA's Office of General Counsel was sufficient to comply with the notice requirement. *See* Brief for Appellee at 25–26; Letter, *supra* note 16. In light of our disposition of the jurisdictional issue, we need not address the question of the sufficiency of the letter as notice under section 505(b)(2) and the corresponding regulations.

**33.** As already noted, text following footnote 25, this modifies the approach set forth in our memorandum of October 3.

**34.** S.Rep.No.414, 92d Cong., 1st Sess. 79 (1971), U.S.Code Cong. & Admin.News 1972, p. 3745, *reprinted in* Environmental Policy Division of the Congressional Reference Service, A Legislative History of the Water Pollution Control Act Amendments of 1972, Vol. II at 1497 (Senate Public Works Comm. Print 1973); *see* H.R.Rep.No.911, 92d Cong., 2d Sess. 133 (1972), *reprinted in* Legislative History, *supra*, Vol. I at 820. *Compare* 33 U.S.C. § 1365 (Supp. II 1972) *with* 42 U.S.C. § 1857h–2 (1970).

**35.** S.Rep.No.1196, 91st Cong., 2d Sess., 36 (1970), *reprinted in* Environmental Policy Division of the Congressional Research Service, A Legislative History of the Clean Air Amendments of 1970, Vol. I at 436 (1974); *see* Senate Debate on S. 4358, Sept. 22, 1970, *reprinted in* Legislative History, *supra*, at 387 (remarks of Senator Cooper).

recognition that "[c]itizens can be a useful instrument for detecting violations and bringing them to the attention of the enforcement agencies and courts alike." [36] It was designed to provide a procedure permitting any citizen to bring an action directly against polluters violating the performance standards and emission restrictions imposed under the law or against the Administrator grounded on his failure to discharge his duty to enforce the statute against polluters. [37]

Anyone even remotely familiar with the case law of the period will discern that this provision took broad steps to facilitate the citizen's role in the enforcement of the Act, both in renouncing those concepts that make federal jurisdiction dependent on diversity of citizenship and jurisdictional amount, and in removing the barrier, or hinderance, to citizen suits that might be threatened by challenges to plaintiff's standing. [38] At the same time, because of the obvious danger that unlimited public actions might disrupt the implementation of the Act and overburden the courts, Congress restricted citizen suits to actions seeking to enforce specific requirements of the Act and conditioned their commencement on the provision of a sixty day notice to the Administrator and the local enforcement agency. [39] The notice requirement was intended to "further encourage and provide for agency enforcement" that might obviate the need to resort to the courts. [40]

### Limitation on Expansion of Federal Jurisdiction

■ The legislative history of the Clean Air Act Amendments reveals that the citizen suits provision reflected a deliberate choice by Congress to widen citizen access to the courts, as a supplemental and effective assurance that the Act would be implemented and enforced. [41]

Congress did not fling the courts' door wide open. As we have already seen, the new provision for citizen suits, section 304(a), was hedged by limitations—the confinement to clear-cut violations by polluters or defaults by the Administrator; and the accompaniment, set

**36.** Senate Debate on S. 4358, Sept. 21, 1970, *reprinted in* Legislative History, *supra* note 35, at 280 (remarks of Senator Muskie); *see* S.Rep.No.1196, *supra* note 35, at 36–38, Legislative History, *supra,* at 436–38; Senate Consideration of the Report of the Conference Committee, Dec. 18, 1970, *reprinted in* Legislative History, *supra,* at 127 (remarks of Senator Muskie). *See also* Letter from Elliot Richardson, Secretary of HEW, to Senator Jennings Randolph, November 17, 1970, *reprinted in* Legislative History, *supra,* at 214 (Administration's views on citizen suits' contribution to enforcement).

**37.** *See* S.Rep.No.1196, *supra* note 35, at 36–39, 64–65, Legislative History, *supra* note 35, at 436–39, 464–65; H.R.Rep.No.1783, 91st Cong., 2d Sess., 55–56 (1970) (Conference Report), *reprinted in* Legislative History, *supra,* at 205–06.

**38.** The most recent standing decisions had been rendered in the context of the standing required to maintain an action for judicial review of agency determinations under section 10 of the Administrative Procedure Act. They required "injury in fact" to an interest "arguably within the zone of interests to be protected or regulated" by the statutes involved. *See* Barlow v. Collins, 397 U.S. 159,

90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

**39.** *See* H.R.Rep.No.1783, *supra* note 37, at 56, Legislative History, *supra* note 35, at 206; Senate Debate, *supra* note 36, *reprinted in* Legislative History, *supra,* at 280 (remarks of Senator Muskie); Senate Debate, *supra* note 35, *reprinted in* Legislative History, *supra,* at 355 (remarks of Senator Hart); at 387 (remarks of Senator Cooper); *cf.* House Consideration of the Report of the Conference Committee, Dec. 18, 1970, *reprinted in* Legislative History, *supra,* at 112 (remarks of Representative Staggers).

**40.** *See* S.Rep.No.1196, *supra* note 35, at 37, Legislative History, *supra* note 35, at 437; Senate Debates, *supra* notes 35 & 36 *reprinted in* Legislative History, *supra,* at 280, 353 (remarks of Senator Muskie).

**41.** *See* S.Rep.No.1196, *supra* note 35 at 64, Legislative History, *supra* note 35, at 464; Senate Consideration, *supra* note 36, *reprinted in* Legislative History, *supra* note 35 at 127 (remarks of Senator Muskie), Senate Debate, *supra* note 35, *reprinted in* Legislative History, *supra,* at 355 (remarks of Senator Hart); at 387 (remarks of Senator Cooper).

forth in section 304(b), of a condition of notice.[42]

### Saving Provision

These were palpably, however, limitations on the expansion of jurisdiction contained in section 304(a), and were not intended as restrictions to curtail federal court jurisdiction over actions that would have been maintainable even in the absence of this special citizen suit provision.[43] This is the fair reading of what Congress intended, and it was articulated in the saving provision of § 304(e).[44]

As the Senate Report states, these restrictions do not "affect in any way whatever remedies such citizens might have under statutory or other law."[45]

### Water Pollution Law Modeled On Clean Air Provisions

The same chime of intent reverberated in the legislative halls in 1972 when Congress came to amend the statute coping with water pollution.[46] The Act under consideration is different from the clean air provisions, as noted in the margin,[47] but there is no difference that is consequential for present purposes.[48]

**42.** See note 39 *supra.* Clean Air Act sections 304(a) and 304(b), 42 U.S.C. §§ 1857h–2(a), 2(b) (1970), are set forth in Appendix B of this opinion.

**43.** See sources cited in note 41 *supra* and note 45 *infra.*

**44.** 42 U.S.C. § 1857h–2(e) (1970) (set forth in Appendix B).

**45.** S.Rep.No.1196, *supra* note 35 at 65, Legislative History, *supra* note 35, at 465; .H.R. Rep.No.1783, *supra* note 37, at 55 ("Other rights to seek enforcement of standards under other provision of law were not affected."), 56 ("The right of persons (or class of persons) to seek enforcement or other relief under any statute or common law is not affected."); Legislative History, *supra,* at 205, 206.

**46.** Although the legislative history of the citizen suits provision of the Federal Water Pollution Control Act Amendments of 1972 (section 505) is not as extensive as the history of section 304 of the Clean Air Act Amendments of 1970, it mirrors the history of section 304 in all significant respects. Congress viewed the citizen suit provision in section 505 as a means of securing citizen participation in the enforcement of the Act. See S.Rep.No.414, *supra* note 34, at 79, U.S.Code Cong. & Admin.News 1972, p. 3745, Legislative History, *supra* note 34, at 1497; H.R.Rep.No.911, *supra* note 34, at 132, Legislative History, *supra* note 34, at 819; Senate Debate on S. 2770, Nov. 2, 1971, *reprinted in* Legislative History, *supra,* at 1306 (remarks of Senator Cooper); Senate Consideration of the Conference Report, Oct. 4, 1972, *reprinted in* Legislative History, *supra,* at 221 (remarks of Senator Bayh). The citizen suits provision's grant of jurisdiction was restricted to violations of specific aspects of the Act and conditioned on the giving of 60 day notice. See S.Rep.No. 414, *supra,* at 79, U.S.Code Cong. & Admin. News 1972, p. 3745 ("[T]he provision in this bill is carefully restricted to actions where violations of standards and regulations or a

failure on the part of officials to act are alleged.") Legislative History, *supra,* at 1497; H.R.Rep.No.911, *supra,* at 133, Legislative History, *supra,* at 820. The saving clause in subsection (e) is identical to that in section 304(e) of the clean air legislation and was intended to have the same effect. See S.Rep. No.414, *supra* note 34, at 81, U.S.Code Cong. & Admin.News 1972, p. 3746 ("[T]he section would specifically preserve any rights or remedies under any other law."), Legislative History, *supra* note 34, at 1499.

**47.** The major difference in the two citizen suits provisions is that the Clean Air Act sought to allow "any person" to sue where as the Federal Water Pollution Control Act restricts standing to "citizens" defined as "persons having an interest which is or may be adversely affected" which is intended to incorporate the standing test of Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). *Compare* 42 U.S.C. § 1857h–2(a) (1970) with 33 U.S.C. § 1365(a), (g) (Supp. II 1972). See S.Rep.No.1236, 92 Cong., 2d Sess. 146 (1972) (Conference Report), U.S.Code Cong. & Admin.News, p. 3776, *reprinted in* Legislative History, *supra* note 34, at 329.

**48.** The modification of the standing provision reflected a compromise struck in conference between the Senate Bill, S. 2770, allowing "any person" to sue and the House Bill, H.R. 11896, limiting standing to "(1) a citizen (A) of the geographic area and (B) having a direct interest which is or may be affected, and (2) any group of persons which has been actively engaged in the administrative process and has thereby shown a special interest in the geographic area in controversy." The compromise explicitly adopted the standing test set forth in *Sierra Club* which was handed down by the Supreme Court shortly before the conferees commenced their deliberations. See note 47, *supra,* House Consideration of Conference Report, Oct. 4, 1972, *reprinted in* Legislative History, *supra* note 34 at 239 (State-

The Act before us is a clear parallel. The interrelationship of the citizen suits provisions is the same as for the clean air statute. The limitations, in subsections (a) and (b) of section 505, restrict the expansion of jurisdiction provided by the special citizen suits provision of section 505(a), and do not cut back on federal court jurisdiction over actions that would have been maintainable even in the absence of that special authorization. This intent is confirmed by the saving clause of subsection (e).[49]

In the wake of section 505(g),[50] which defines a citizen as a person having an interest which is or may be adversely affected, the provision in section 505(a)(2) may add little to the jurisdiction of federal courts as a practical matter.[51] That may come to depend on whether the Supreme Court sustains the view of this court that the Administrative Procedure Act is a grant of jurisdiction.[52] It may come to depend on the number of instances. in which actions cannot satisfy the jurisdictional amount provision of 28 U.S.C. § 1331.[53] But these considerations do not add or detract from our discernment of the basic legislative intention as to the relationships between subsections (a), (b) and (e).[54]

*Precedents*

Ours is apparently a case of first impression at the circuit court level. The District Court rulings are in disarray,[55]

---

ment of Representative Jones), 249–50 (remarks of Representative Dingell). The conferees made no mention of that decision's impact on the interworking of sections 505(a) and 505(e) and gave no indication that the standing modification was to change the intent, expressed in both the Senate and House reports, *see* note 46 *supra,* that citizen suits serve as an additional means of achieving the Act's goal of "public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program established . . . under this Act." Section 101(e) of the Act, 33 U.S.C. § 1251(e) (Supp. II 1972).

**49.** *See* notes 31 and 46 *supra*; *cf.* note 45 and accompanying text *supra.*

**50.** 33 U.S.C. § 1365(g) (Supp. II 1972).

**51.** While the "adversely affected" language precludes a vindication of mere philosophical values (as *Sierra Club* holds, 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)), it is hospitable to actions by citizens whose claim of factual injury is very widely shared, indeed, as appears from United States v. SCRAP, 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

**52.** *See, e. g.,* Independent Broker-Dealers' Trade Ass'n v. SEC, 142 U.S.App.D.C. 384, 442 F.2d 132, cert. denied, 404 U.S. 828, 92 S.Ct. 63, 30 L.Ed.2d 57 (1971); Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970). For a more complete discussion of the conflict in circuits regarding this point see this court's recent decision in Pickus v. Board of Parole, 165 U.S.App. D.C. 284, 507 F.2d 1107 (1974).

**53.** Since this court has found that the Administrative Procedure Act is an independent source of jurisdiction regardless of amount in controversy, the elimination of the amount in controversy requirement in section 505(a)(2) may not have the effect of expanding the opportunity for suits against the Administrator for failure to perform a nondiscretionary duty if our view of the APA is upheld. *See* cases cited at note 52 *supra.*

**54.** *See* notes 46 and 48 *supra.*

**55.** Two cases decided under the Clean Air Act have found that actions coming within the subject matter of that statute's analogue of section 505(a) could not be brought under other jurisdictional statutes. *See* Pinkney v. Ohio EPA, 375 F.Supp. 305 (N.D.Ohio 1974) (reading subsection (e) as applying to suits under "laws other than the Clean Air Act"); Riverside v. Ruckelshaus, 4 ERC 1728, 1730 (C.D.Cal.1972) (concluding that the provisions of subsection (e) "do not apply in this case, since this is a suit . . . covered by subsection (a)(2)."). By contrast, two courts have rejected EPA's claim that subsection (a)(2) is the exclusive source of jurisdiction for suits seeking to compel the discharge of a nondiscretionary duty by the Administrator. *See* Highland Park v. Train, 374 F.Supp. 758 (N.D.Ill.1974) (finding that subsection (e) is an "apparent saving clause" and that the complaint's allegation that the Administrator failed to promulgate regulations "clearly bring the complaint within the purview of the general federal question statute."); NRDC v. Quarles, No. 1629–73 (D.D.C., Feb. 1, 1974) ("An extensive discussion is unnecessary since jurisdiction exists by virtue of 28 U.S.C. § 1331 (1970).").

In addition, a number of district courts have found subject matter jurisdiction in suits alleging that the Administrator failed to perform a nondiscretionary duty under section 205 of the Federal Water Pollution Con-

and while we appreciate the efforts of the judges involved and have given consideration to their opinions, we have been able, with the benefit of full briefs and our own research, to adduce a more ample perspective for the issue. We may add that if the Government's present contention is sound the "impoundment" cases—which sustained a charge of a violation of nondiscretionary duty in the failure of the Administrator to make an allotment of authorized funds pursuant to sections 205 and 207 of the Act—could not have been maintained under 505(e) but would have had to be brought under 505(a)(2).[56] The impoundment litigation illustrates the danger that a broad reading of 505(a)(2) as exclusive would sweep into that subsection far more than Congress really had in mind.

### B.

*Notice and Exhaustion of Administrative Remedies*

■ Even where, as in this case, the notice provision of section 505(b)(2) is not a jurisdictional prerequisite,[57] the courts may properly give effect to the salutary purpose underlying the notice provision by resort to familiar doctrines such as those underpinning the require-

ment of exhaustion of administrative remedies. The notice provision was designed to obviate the need for judicial recourse by affording the agency the "opportunity to act on the alleged violation."[58] Sound discretion bids a court stay its hand upon petition by the Administrator where it has reason to believe that further agency consideration may resolve the dispute and obviate the need for further judicial action. However, the court has jurisdiction and may maintain the action on its docket in a suspense status, and even grant temporary relief.[59] And the court may promptly proceed to the merits of the action when it is confident or becomes confident that agency recourse is futile, as where the agency's position is firm.

■ Considerations pertaining to exhaustion of remedies and primary jurisdiction have little relevance when raised for the first time by an agency appealing from a court order. We are presented with no evidence that the agency desires to reassess its plans for implementing section 304(b)(1)(A) and the course of the present action clearly indicates that the agency's position with regard to its discretion under that section is firmly rooted.

---

trol Act, 33 U.S.C. § 1285, to allot all funds appropriated by Congress for construction of waste treatment plants. *See* Texas v. Fri, 5 ERC 2021 (W.D.Tex.1973) (no jurisdictional allegation mentioned in the opinion); Minnesota v. EPA, 5 ERC 1586 (D.Minn.1973) (jurisdiction alleged under 5 U.S.C. § 702(a), 28 U.S.C. §§ 1331, 1361); Campaign Clean Water v. Ruckelshaus, 361 F.Supp. 689 (E.D. Va.), remanded with directions, 489 F.2d 492 (4th Cir.), cert. granted, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 557 (1974) (jurisdiction alleged under 28 U.S.C. § 1331, 1361); New York City v. Ruckelshaus, 358 F.Supp. 669 (D.D.C.1973), aff'd, 161 U.S.App.D.C. 114, 494 F.2d 1033, cert. granted, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 557 (1974) (jurisdiction alleged under section 505(e) of the Act, [as appears from the District Court's corrective order dated, May 17, 1973], 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1332, 1361).

**56.** New York City v. Ruckelshaus, *supra* note 55, was brought under section 505(e), but the other opinions do not mention either section 505(a) or section 505(e).

**57.** This case was brought under 5 U.S.C. §§ 701–706, and 28 U.S.C. §§ 1331, 1361, 2201–2202 rather than under section 505(a)(2) of the Act. *See* note 32 *supra*.

**58.** *See* S.Rep.No.414, *supra* note 34, at 80, U.S.Code Cong. & Admin.News 1972, p. 3745, Legislative History, *supra* note 34, at 1498; Senate Consideration of the Report of the Conference Committee, *supra* note 46, *reprinted in* Legislative History, *supra*, at 179 (exhibit prepared by Senator Muskie); sources cited at note 40 *supra*.

**59.** Even where the court stays its hand as to a determination of the merits, it may grant relief pendente lite to safeguard plaintiff's rights from irreparable injury during the pendency of administrative review. *See* Wheelabrator v. Chafee, 147 U.S.App.D.C. 238, 248–249, 455 F.2d 1306, 1316–1317 (1971); M. Steinthal & Co. v. Seamans, 147 U.S.App.D.C. 221, 237, 455 F.2d 1289, 1305 (1971).

## II. MERITS

### A. One-year Deadline

#### 1. As to point sources within section 306 categories

The controversy presented in this case focuses on the interpretation of the Administrator's duty to publish effluent limitation guidelines under section 304(b)(1)(A) of the Act. That provision reads as follows:

(b) For the purpose of adopting or revising effluent limitations under this chapter the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, published within one year of October 18, 1972, regulations, providing guidelines for effluent limitations and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall—

(1)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources (other than publicly owned treatment works);

The District Court held that the section imposed a "mandatory, nondiscretionary duty to publish within one year of enactment of the Act final Section 304(b)(1)(A) effluent limitation guidelines necessary to provide comprehensive coverage of all point source discharges."[60] It ordered the Administrator to publish all effluent guidelines by November 29, 1974, in accordance with a schedule which divided the categories of point sources into two groups.[61] The Administrator challenges this conclusion, urging that he has discretion over the date of publication of guidelines for those categories of point sources contained in Group II of the order.[62]

■ As to the 27 categories of sources contained in Group I of the order, which are all listed in section 306(b)(1)(A) of the Act, EPA concedes that it has a duty under the Act to promulgate effluent limitation guidelines within one year of the enactment of the statute.[63] The District Court's order requiring publication of guidelines for those point sources in conformity with its prescribed timetable was a proper exercise of jurisdiction under section 505(a)(2) to compel performance of a statutory duty that has been unreasonably delayed.

■ The District Court acted reasonably in using a publication schedule as a means of implementing its order. The October 18, 1973, statutory deadline had passed without the publication of a single effluent limitation guideline. In light of the failure of the agency to meet its acknowledged duty under the Act,[64] the District Court's decision to incorporate a timetable into the order constituted a reasonable step to facilitate supervision of the decree and to assure early efforts by the delinquent defendant toward eventual discharge of its statutory responsibility. Sound principles counsel resort to a structured type of order where the court seeks to compel completion of a task which will necessarily extend over a substantial period.[65] Requiring the courts to rely on mere exhortation to move with expedition toward compliance within a "reasonable time" would undercut their ability to

---

60. 6 ERC 1033 (D.D.C.1973). (granting summary judgment to plaintiff).

61. Id. at 1033–35. (order enforcing judgment of Nov. 15, 1973).

62. Brief for Federal Appellants at 12–18.

63. Id. at 12–13.

64. See Id.; Letter from Robert V. Zener, Acting Deputy General Counsel of EPA to J. G. Speth, counsel for NRDC, June 15, 1973, at 1–2; App. 62–63.

65. See NRDC v. EPA, 154 U.S.App.D.C. 384, 386–388, 475 F.2d 968, 970–972 (1973); cf. United States v. Montgomery Cty. Bd. of Educ., 395 U.S. 225, 232–235, 89 S.Ct. 1670, 23 L.Ed.2d 263 (1969); Green v. County Sch. Bd., 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

spur reticent defendants to render the performance to which the plaintiff and public are entitled. The authority to set enforceable deadlines both of an ultimate and an intermediate nature is an appropriate procedure for exercise of the court's equity powers to vindicate the public interest.[66].

The procedure employed in formulating and applying the Group I timetable also represented a proper exercise of the District Court's discretion. The District Judge's reliance upon the parties to draft a proposed timetable provided a measure of assurance that the order would be workable.[67] In addition to this initial receptivity to the views of the parties, the court demonstrated a willingness to accommodate objections by EPA and *amici curiae* to certain publication deadlines by modifying the timetable.[68] In light of the April 18 modification granted at the urging of *amici*,[69] we view the March 14 statement that "the Court will countenance no further delays nor requests for same" as expressing a firm commitment to expeditious compliance rather than a rigid bar that would foreclose consideration of future meritorious petitions for modifications that retained the essence of prompt performance, and proposed adjustments in detail.[70]

2. *As to point sources within other categories*

With respect to the Group II categories, we reach a conclusion different from that announced by the District Court. Although we recognize that substantial support can be marshalled for the position that all section 304(b)(1)(A) guidelines were due on October 18, 1973, we believe that contrary indications in the Act's legislative history, combined with the deference due the agency's interpretation of the statute, require us to vacate the portion of the District Court's order dealing with nonsection 306(b)(1)(A) point source categories.

Initially, we note that the language of the disputed provision does not foreclose either the reading given it by NRDC or that espoused by the Administrator. Although the statute requires that guidelines for classes and categories of point sources shall be published within one year, it does not state that guidelines for *all* classes and categories shall be completed within that period. Moreover, the language of section 304(b)(1)(A) resembles that employed in section 307(a)(1) which both parties interpret as affording the Administrator discretion over the time of listing some of the toxic pollutants to be regulated under that section.[71]

The Administrator contends that although the Act mandates publication of some guidelines by October 18, 1973, it provides him with discretion over the determination of point source categories beyond the 27 listed in section 306(b)(1)(A) and over the publication of guidelines for those additional classes

---

**66.** *Cf.* Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).

**67.** *See* 6 ERC 1033 (D.D.C.1973); Brief for Appellee at 19–20.

**68.** The District Court has twice granted EPA's motions for modification of the November 27, 1973 order. *See* Order, Jan. 30, 1974, App. 13–14; Order, Mar. 14, 1974, App. 18–21. On April 18 it granted a modification for steam electric powerplants at the behest of Alleghany Power System, Inc., and other power companies appearing as amici curiae. App. 23–24.

**69.** *See* note 68, *supra.*

**70.** See Order, March 14, 1974, at 1, App. 18. Later in this opinion we shall briefly examine the problem of the inability of a defendant to comply with a court order and its relationship to requests for modification and enforcement of orders. *See* notes 89–97 and accompanying text *infra.*

**71.** *See* Brief for Appellants NRDC, et al., at 36–37, NRDC v. Train, No. 74–1538 (D.C.Cir., filed May 28, 1974); Brief for Appellee EPA at 20–21, NRDC v. Train, No. 74–1538 (D.C. Cir., filed May 28, 1974).

Section 307(a)(1) states that "[t]he Administrator shall, within ninety days after the date of enactment of this title, publish (and from time to time thereafter revise) a list which includes any toxic pollutant or combination of such pollutants for which an effluent standard . . . will be established under this section." 33 U.S.C. § 1317(a)(1) (Supp. II 1972).

and categories. The House Public Works Committee Report on the amendments bill links section 304(b)(1)(A) and 306(b)(1)(A) and indicates the discretion of the Administrator with regard to nonsection 306 source categories. It states:

> As required in section 304(b)(1)(A), the Administrator, by regulations, is to identify the degree of effluent reduction attainable by the application of the best practicable control technology currently available for classes and categories of point sources. By this the Committee expects that the Administrator will concentrate on, but not be limited to, those categories of point sources enumerated in section 306(b)(1)(A) and any which the Administrator might add to that list.[72]

This passage indicates that the 27 categories set forth in section 306 were intended to form the nucleus of the sources for which guidelines would be developed under section 304. The Administrator quite properly could conclude that Congress intended these items to receive first priority in the guideline formulation process and that the discretion provided him in delineating additional point sources extended to the publication date of the guidelines for those sources.

 Supreme Court decisions counsel us to show "great deference to the interpretation given the statute by the officers or agency charged with its administration."[73] The deference owed the meaning placed on an act by the administrative body is heightened when the case involves the construction of a new statute by its implementing agency.

> Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new."[74]

This interpretation of section 304(b)(1)(A) in this case was neither an afterthought of counsel nor a practice so informal as to raise doubts whether it was reflectively deliberated. This passage in the House Report is relied upon in the June 15, 1972, letter from EPA's Acting Deputy General Counsel which was a considered disposition by key agency officials. The agency's good faith reliance on the congressional intent underlying section 304(b)(1)(A) is entitled to weight in the scales, and under the circumstances present in this case that weight is decisive. We find that the Act does not require the publication of guidelines for nonsection 306(b)(1)(A) categories within one year after its enactment as a nondiscretionary imperative.

B. *Primary Duty To Publish Guidelines for All Categories of Point Sources By December 31, 1974*

 The Administrator contends that "Section 304(b)(1)(A) grants [him] the authority and discretion to determine which classes and categories of point source discharges require the publication of guidelines and when those guidelines should be issued."[75] While we agree with the Administrator that he has some latitude concerning the date of publication of guidelines for Group II categories, we do not accept the position that this discretion is at large. It is our view that the Act and its legislative history reign in the Administrator's discretion.

---

72. H.R.Rep.No. 911, *supra* note 34, at 107, Legislative History, *supra* note 34 at 794.

73. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *Accord, e. g.,* Zuber v. Allen, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); United States v. American Trucking Ass'ns, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

74. Power Reactor Development Co. v. International Union of Electricians, 367 U.S. 396,

408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961), *quoting* Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 77 L.Ed. 796 (1933). *Accord, e. g.,* United States v. Zucca, 351 U.S. 91, 96, 76 S.Ct. 671, 100 L.Ed. 964 (1956); United States v. American Trucking Ass'ns, *supra* note 73.

75. Supp. Brief for Federal Appellants at 9.

The interrelationship of sections 301(b), 304(b), and 402, establishes that the Administrator has a primary duty to publish section 304(b)(1)(A) guidelines by December 31, 1974.

The Act relies on effluent limitations on individual point sources as the "basis of pollution prevention and elimination."[76] The achievement of these limitations depends on coordination of the different roles played by sections 301(b), 304(b), and 402 in the formulation and implementation of the effluent limitations. Section 301(b) contains a broad description of the phase one and phase two effluent limitations, to be achieved by July 1, 1977, and July 1, 1983, respectively. The limitations established under section 301(b) are to be imposed upon individual point sources through permits issued under the National Pollutant Discharge Elimination System (NPDES) established by section 402.[77] Those permits are to contain schedules which will assure phased compliance with the effluent limitations no later than the final dates set forth in section 301(b).[78] Section 304(b) calls for the publication of regulations containing guidelines for effluent limitations for classes and categories of point sources. These guidelines are intended to assist in the establish-

ment of section 301(b) limitations that will provide uniformity in the permit conditions imposed on similar sources within the same category by diverse state and federal permit authorities.[79]

The timetable governing the operation of these sections is controlled by the schedule for the issuance of permits under section 402. Section 301(a) of the Act prohibits the discharge of any pollutant unless there is compliance with the other sections listed therein.[80] The key provision referred to in section 301(a) is section 402, which pertains to the creation of the national pollution discharge elimination system and the issuance of permits thereunder.[81] Section 402(k) makes December 31, 1974, a critical date. Until then, the pendency of a permit application will prevent a finding of violation of section 301.[82] After December 31, 1974, however, persons discharging pollutants must have obtained a permit in order to have a legal defense against prosecution. Obviously, Congress contemplated that the task of evaluating permit applications and issuing permits would be completed by that date.[83]

The Act's text and its legislative history make clear that as a general matter the section 304(b)(1) guidelines and the

**76.** *See* S.Rep.No. 414, *supra* note 34, at 8; U.S.Code Cong. & Admin.News 1972, p. 3675; Legislative History, *supra* note 34, at 1426.

**77.** *See* S.Rep.No. 414, *supra* note 34, at 42, U.S.Code Cong. & Admin.News 1972, p. 3709 ("The program proposed by this Section [301] will be implemented through permits issued in Section 402."), 44, and 51 ("[E]ffluent limitations reflecting the mandate of section 301 . . . will be imposed as conditions of permits issued under section 402."), Legislative History, *supra* note 34, at 1460, 1462, and 1469; H.R.Rep.No. 911, *supra* note 34, at 157 ("Effluent limitations required by Section 301 would be established and applied to all point sources of discharges covered by the Act by means of the permits issued under Title IV."), Legislative History, *supra*, at 844.

**78.** *See* S.Rep.No. 1236, *supra* note 47, at 140, U.S.Code Cong. & Admin.News 1972, p. 3776, Legislative History, *supra* note 34, at 323; Senate Consideration of the Conference Report, *supra* note 46, *reprinted in* Legislative History, *supra*, at 174 (exhibit of Senator Muskie). The regulations requiring the incor-

poration of compliance schedules in section 402 permits are set out at 40 C.F.R. § 124.44 (1973).

**79.** *See* notes 89, 90, 98 and 99 and accompanying text *infra*.

**80.** 33 U.S.C. § 1311(a) (Supp. II 1972). The other sections listed in section 301(a) are sections 302, 306, 307, 318, 402 and 404.

**81.** *Id.* § 1342.

**82.** *Id.* § 1342(k).

**83.** *See* Senate Consideration of the Conference Report, *supra* note 46, *reprinted in* Legislative History, *supra* note 34, at 176 ("The Conferees also agreed that there should be no enforcement action taken for failure to have a permit until December 31, 1974, in order to provide an adequate opportunity for the Administrator to review and issue or not issue permits for the applications that are pending on date of enactment or will be pending as a result of expansion of the program." (Exhibit of Senator Muskie); House Consideration of the Conference Report, October 4, 1972, *reprinted in* Legislative History, *supra*, at 274 (remarks of Representative Clark).

section 301(b)(1) limitations were to be developed prior to the issuance of permits. Sections 402(a) and 402(b) require that permits issued by the Administrator and by the states assure compliance with the effluent limitations of section 301.[84] The Senate Report confirms the interdependence of the three provisions. That report states that "[s]ubsection (b) of this section [304] requires the Administrator, within one year after enactment, to publish guidelines for setting effluent limitations reflecting the mandate of section 301, which will be imposed as conditions of permits issued under section 402."[85] Another portion of the Senate Report indicates that at least 30 months lead time is required to afford industries an opportunity to complete construction and modifications necessary to comply with the phase one effluent limitation deadline.[86] Under the final version of the Act, effluent limitations and permits would be required by December 31, 1974, in order to provide polluters 30 months to comply with the July 1, 1977, deadline.

EPA seeks to play down the importance of section 304(b)(1)(A) guidelines in the implementation of the permit system, and hence the materiality of the December 31, 1974, date in the timing of those guidelines. The agency points to the failure of Congress to mention section 304 in section 402's permit provisions and to the authorization, in section 402(a)(1), of the issuance of permits prior to implementation of numerous sections including section 301.[87]

While section 402's permit provisions do not refer expressly to section 304, they do refer to section 301. And section 304(b)'s statement that the guidelines are "for the purpose of adopting or revising effluent limitations," plainly establishes section 304 guidelines as the primary means of implementing the section 301 limitations.[88] The role of the guidelines in shaping the section 301(b) limitations is made clear in the Senate Report:

These guidelines [section 304(b)] would identify what constituted the "best practicable control technology currently available" and the "best available control measures and practices," and the degree of effluent reduction attainable through the application of each. Thus, these guidelines would define the effluent limitations required by the first and second phases of the program established under section 301.[89]

As Senator Muskie succinctly stated: "The information under section 304(b) is to be applied in setting effluent limitations."[90]

84. See 33 U.S.C. §§ 1342(a), (b) (Supp. II 1972).

85. S.Rep.No. 414, supra note 34, at 51, U.S. Code Cong. & Admin.News 1972, p. 3717, Legislative History, supra note 34, at 1469.

86. See S.Rep.No.414, supra note 34, at 44, U.S.Code Cong. & Admin.News 1972, p. 3668, Legislative History, supra note 34, at 1462. The report calls for permits to be issued by mid-1973 with the 30 month period expiring on January 1, 1976. The Act sets the date for the achievement of the phase one effluent limitations eighteen months later than the deadline in the Senate bill. See S.Rep.No. 1236, supra note 47, at 120, Legislative History, supra note 34, at 303.

87. See Supp. Brief for Federal Appellants at 4–5.

88. 33 U.S.C. § 1314(b) (Supp. II 1972).

89. S.Rep.No.414, supra note 34, at 51, U.S. Code Cong. & Admin.News 1972, p. 3717, Legislative History, supra note 34, at 1469.

90. Senate Debate on S.2770, Nov. 2, 1973, reprinted in Legislative History, supra note 34, at 1391; As Senator Bentsen put it "the regulations which we anticipate the Administrator shall issue pursuant to section 301 and section 304" elaborate the general target of section 301(b) to achieve effluent reductions based on the application of the "best practicable control technology currently available" by the July 1, 1977, phase one deadline. Id. at 1283. See also Senate Consideration of Conference Report, supra note 46, reprinted in Legislative History, supra note 34, at 171 (The precise treatment requirements and specific time schedules contained in the section 402 guidelines are to be "based upon the time elements of Section 301 and the guidelines of Section 304.") (exhibit of Senator Muskie).

EPA correctly notes that under section 402(a) EPA may issue permits—upon "such conditions as the Administrator determines are necessary to carry out the provisions of this Act"—prior to taking implementing action with regard to listed sections including section 301.[91] Although Congress contemplated that the permit program would be begun before the establishment of the section 301 effluent limitations, we believe it intended that EPA formulate effluent limitations for the great bulk of point source categories prior to completing the permit process for existing polluters.[92]

Section 402 was designed to give responsibility for issuing permits to states that established a program conforming to procedural guidelines to be issued by EPA within 60 days of the enactment of the statute.[93] Congress sought to expedite these procedural guidelines to enable the states to qualify to issue permits as soon as possible after the passage of the Act.[94] It believed that the states would shoulder the primary burden of issuing permits to individual dischargers.[95] With the establishment of a qualified state program, EPA duties were to be restricted to assuring that the state followed the procedural guidelines and to reviewing individual permits of major significance.[96]

The decentralization of permit issuing authority envisioned by section 402 prompted concerns that industrial threats to relocate in areas where pollution controls were less restrictive would coerce states into adopting lax permit requirements.[97] The effluent limitation guidelines contained in section 304(b) and the corresponding effluent limitations to be promulgated under section 301(b) were intended to safeguard against industrial pressures by establishing a uniform "minimal level of control imposed on all sources within a category or class."[98] Senator Muskie emphasized the function of the guidelines in promoting uniformity. He stated that "[t]he Administrator is expected to be precise in his guidelines so as to assure

91. See 33 U.S.C. § 1342(a)(1) (Supp. II 1972).

92. The discussion of this provision in the House Report indicates that Congress intended that the initiation of the permit program should not be postponed until the listed sections were implemented and that Administrator's determination of conditions was to form the basis of permits during the "interim period" prior to promulgation of the other regulations. See H.R.Rep.No.911, supra note 34, at 126, Legislative History, supra note 34, at 813.

93. See 33 U.S.C. § 1314(h) (Supp. II 1972); note 95 infra.

94. See S.Rep.No.414, supra note 34, at 54, U.S.Code Cong. & Admin.News 1972, p. 3668, Legislative History, supra note 34, at 1472; House Consideration of the Conference Report, supra note 83, reprinted in Legislative History, supra, at 261 (remarks of Representative Wright).

95. See House Consideration of the Conference Report, supra note 83, reprinted in Legislative History, supra note 34, at 262 (remarks of Representative Wright), 274 (remarks of Representative Clark); House Debate on H.R. 11896, March 28, 1972, reprinted in Legislative History, supra, at 580 (remarks of Representative Terry); S.Rep.No.414, supra note 34, at 71, Legislative History, supra, at 1489.

As of June 30, 1974, only 15 states had been authorized to issue permits. See BNA Env. Rep.—State Water Laws, ¶ 601:0101 (1974).

96. See S.Rep.No.414, supra note 34, at 71, U.S.Code Cong. & Admin.News 1972, p. 3668, Legislative History, supra note 34, at 1489. Section 402(c)(3) empowers the Administrator to withdraw approval of state programs which deviate from the requirements of the Act after notice and opportunity to take corrective action. Section 402(d)(2) authorizes the Administrator to review individual permits granted by the states. Such review may be waived as to any permit application, under section 402(d)(3), or by regulation waiving review for particular classes of point sources under section 402(e). Congress expected the Administrator to review only a limited number of permits of major importance. See id.

97. See House Debate on H.R. 11896, supra note 95, reprinted in Legislative History, supra note 34, at 452–53, 577 (remarks of Representative Reuss), 472, 475 (statement of Governor Wendell B. Anderson); Senate Debate on S.2770, supra note 46, reprinted in Legislative History, supra, at 1405 (remarks of Senator Muskie).

98. See Senate Consideration of the Conference Report, supra note 46, reprinted in Legislative History, supra note 34, at 170 (exhibit of Senator Muskie).

that similar point sources with similar characteristics, regardless of their location or the nature of the water into which the discharge is made, will meet similar effluent limitations." [99] Prior to the promulgation of effluent limitations under section 301, the director of a state program is instructed merely to impose such terms and conditions in each permit as he determines are necessary to carry out the provisions of the Act.[100] Once an effluent limitation is established, however, the state director and the regional EPA administrator are required to apply the specified, uniform effluent limitations, modified only as necessary to take account of fundamentally different factors pertaining to particular point sources within a given class or category. Any variation in the uniform limitations adopted for specific dischargers must be approved by the Administrator.[101]

The interrelationship of sections 301(b), 304(b), and 402 underscores the contemplation of Congress that the Administrator has a primary responsibility to publish effluent limitation guidelines for the great bulk of the classes and categories of point sources prior to the December 31, 1974, date by which existing polluters must obtain permits. The general expectation of Congress was that the Administrator would define classes and categories of point sources and would publish guidelines prior to the issuance of the individual permits. The contours of the Administrator's duty with respect to section 304(b)(1)(A) guidelines are revealed by the purposes which those guidelines were designed to serve.

## C. December 31, 1974 Deadline and Possibility of Exceptions

■ There may be a number of marginal classes of point sources containing a limited number of diverse dischargers for which class guidelines would serve little or no purpose. The Administrator may establish that he has no duty to publish guidelines for a specific class of point sources by showing that such guidelines would not be needed to promote the uniformity of permit conditions sought by Congress. The statutory framework is not so tightly drawn as to require guidelines for each and every class and category of point source re-

---

**99.** *Id.* at 172. Senator Muskie emphasized that uniformity was one of the "three essential elements" of the Senate bill.

As far as uniformity and finality are concerned, the conference agreement provides that each polluter within a category or class of industrial sources will be required to achieve nationally uniform effluent limitations based on "best practicable" technology no later than July 1, 1977.

Legislative History, *supra* note 34, at 162.

**100.** *See* 40 C.F.R. § 124.42(b) (1973).

**101.** EPA has adopted the approach of promulgating a single set of regulations that incorporate the section 301(b) limitations as part of the section 304(b) effluent limitation guidelines. The limitations are specified for subcategories within the relevant point source class and are to be applied to individual point sources unless the permit issuing authority determines that particular polluters present factors which are "fundamentally different" from those considered in formulating the regulations. *See, e. g.,* Effluent Limitation Guidelines and Standards for Dairy Products, Subpart A—Receiving Stations Subcategory, 40 C.F.R. § 405.12 (1974). This approach was recently upheld in E.I. DuPont De Nemours & Co. v. Train, 383 F.Supp. 1244 (W.D. Va., 1974) (involving effluent limitation guidelines for the sulfuric acid production subcategory of the inorganic chemicals manufacturing point source category, 40 C.F.R. § 415.212 (1974)).

Our discussion of EPA's present practice is intended merely to illustrate the role played by the section 304(b) guidelines in achieving the statutory goal of uniform effluent limitations for "similar point sources with similar characteristics." *See* note 99 and accompanying text *supra.* We do not rule on the propriety of the Administrator's regulations implementing sections 301 and 304 or on the validity of the form, format, or content of any particular effluent guidelines or limitations previously promulgated by EPA. Such matters involve questions that go beyond our present focus on the time limits contemplated by the Act for publication of section 304(b)(1)(A) effluent limitation guidelines.

The foregoing paragraph was added to our opinion, by amendment of March 10, 1975, in response to a motion filed by *amicus curiae,* American Petroleum Institute et al., to avoid any possible misinterpretation of the scope of our ruling.

gardless of the need for uniform guidelines or to mandate that all guidelines be published by December 31 regardless of their quality or the burden that task would place upon the agency.

However, the general contemplation that guidelines would precede individual permits indicates that guidelines serving the objectives of the Act are to be published prior to December 31, 1974, unless the Administrator offers a justification for abstention or delay, demonstrating that he has not failed to discharge his general duty with respect to section 304(b)(1)(A) guidelines.

 Since we have concluded that the bulk of the guidelines are to be published by December 31, 1974, we find no present failure on the part of the Administrator to meet his responsibility to issue effluent limitation guidelines for non-section 306 source categories. Although some lead time between guideline publication, effluent limitation promulgation, and permit issuance is desirable to facilitate the use of the limitations in the formulation of permit conditions, it is possible that the statutory objective can be accomplished by coordination within the agency as both processes proceed together toward finalization and by the use of proposed guidelines and limitations prior to their effective date.[102] In any event, the Act does not provide us with a benchmark for gauging when, prior to December 31, the Administrator had a duty to issue regulations pertaining to any particular point source category.[103] Where there has been no violation of a statutory duty, we think the proper course is to confine ourselves to a declaration of the intent of Congress and to give the Administrator latitude to ex-

**102.** NRDC has repeatedly urged that the section 304(b)(1)(A) guidelines must cover all point sources because section 301(e) requires that effluent limitations be applied to all point sources. *See* Brief for Appellee at 29; Appellee's Reply to Supp. Brief for Federal Appellants at 5. We do not believe that the statute requires guidelines covering all point sources. First, there may well be isolated point sources that do not come within a class or category and thus are not included in the section 304(b)(1)(A) requirement of guidelines for classes and categories of point sources. Second, the statute does not prohibit the promulgation of effluent limitations for point sources in the absence of guidelines; rather it contemplates the use of guidelines to set limitations in the vast majority of cases in which guidelines serve to assure nationwide uniformity. *See* note 99 and accompanying text *supra*.

**103.** We are not unaware that November 29, 1974—which is the latest date set in the District Court's order for publication of a Group II guideline—will ordinarily, at least, be the latest date contemplated by Congress for publication. The reason is that Congress contemplated that a regulation containing guidelines "will be subject to the normal requirements which apply to Federal regulations, such as publication in the Federal Register and availability for public comment . . ." Senate Consideration of Conference Comm. Report, October 4, 1972, Legislative History, *supra* at p. 172. The "normal" requirement is for publication of a proposed rule not less than 30 days prior to the effective date of the rule, *See* 5 U.S.C. § 553(d). However, section 553(b) permits an agency to dispense with all notice of proposed rule making "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." And section 553(d) permits the publication of a proposed rule to be less than 30 days prior to effective date if so "provided by the agency for good cause found and published with the rule."

These "escape" clauses preclude a ruling that the agency is without authority to issue a rule on December 31 (and permits the same day) however difficult that may be for a court to visualize.

It is only fair to interject that the spirit of the Senate Committee's intention that there be opportunity for public comment would seem to require that if a rule has been issued without affording such opportunity, the rule itself should contain a provision whereby the agency will undertake to consider and act upon petitions for reconsideration that are filed promptly, and hence will provide opportunity for correction before the rules (*i. e.* the guidelines) are set so hard that they cannot be unmolded. This prompt reconsideration, of petitions filed no more than 30 days after issuance, would be a more meaningful correction than the general statutory contemplation for annual revisions.

The need for public comment on proposed guidelines prior to their taking effect is mitigated by EPA's extensive efforts to secure comments on technological data developed prior to the formulation of proposed guidelines. *See* note 105 *infra*.

ercise his discretion in shaping the implementation of the Act. We adhere to this view despite the Administrator's default in meeting the October 18, 1973, deadline for section 306 source categories. This is a question of law, and once the law has been judicially interpreted the agency can be expected to shoulder the task of compliance.

Even if we were to accept NRDC's position that the Administrator had a nondiscretionary duty to publish guidelines for all point source categories, we would still have to acknowledge the need for some leeway for modification of the December 31, 1974, deadline when circumstances preclude the formulation of adequate guidelines by that date. Although we believe that guidelines covering most point source categories should be readied by that date, we do not read the statutory scheme as categorically mandating that all guidelines be published by that time.

At the present time, we cannot say that EPA's apprehension that it will not be able to publish the great majority of guidelines by the December 31, 1974, deadline is a broadly valid concern when applied generally to non-section 306(b)(1)(A) point source categories. The effluent limitation guidelines required by section 304(b)(1)(A) are to be based on the "best practicable control technology currently available." [104] The agency's task is to identify point source categories, to determine the nature of the pollutants discharged, to ascertain the best practicable technology available for discharge control, and to calculate the effluent reduction achievable through application of that technology. Although these steps may be cumbersome, even awesome, they may well be within the agency's grasp, at least generally. The court's injunction should serve like adrenalin, to heighten the response and to stimulate the fullest use of resources.

This may run the risk of overstimulating the organism, but palliative measures may be taken with regard to specific categories if indicated at a later date.

However, the looming December 31 deadline, and the dread of a judicial overdose, suggests the need to address ourselves to the problem identified by the agency, for the future guidance of the District Court. The record before us does not contain sufficient data to evaluate the potential difficulties that might preclude the publication of guidelines for specific categories by the December 31 deadline. The Act contemplates that the agency's guidelines will be defensible if attacked by polluters seeking to avoid the effluent limitations. We perceive two types of constraints which might delay the formulation of adequate guidelines for some few categories of point source beyond the deadline established by the Act. First, it is possible that budgetary commitments and manpower demands required to complete the guidelines by December 31 are beyond the agency's capacity or would unduly jeopardize the implementation of other essential programs. Second, EPA may be unable to conduct sufficient evaluation of available control technology to determine which is the best practicable or may confront problems in determining the components of particular industrial discharges. The courts cannot responsibly mandate flat guideline deadlines when the Administrator demonstrates that additional time is necessary to insure that the guidelines are rooted in an understanding of the relative merits of available control technologies. The delay required to give meaningful consideration to the technical intricacies of promising control mechanisms may well speed achievement of the goal of pollution abatement by obviating the need for time-consuming corrective measures at a later date.[105]

104. *See* 33 U.S.C. § 1314(b)(1)(A) (Supp. II 1972).

105. EPA has taken great care to maximize the amount of comment and analysis of the technological basis and reasoning underlying its effluent limitation guidelines. Instead of relying on comments by interested parties on proposed guidelines, the agency has made available to any interested person the technical analysis of issues prepared by private con-

■ Should the Administrator conclude that manpower or methodological constraints threaten to delay guidelines for particular categories beyond December 31, he may attempt to demonstrate to the courts that such conditions require an extension of the deadline for specific categories.[106] Contentions relating to particular point source categories are to be presented as an initial matter before the District Court charged with supervision and enforcement of this court's order. The District Court will, in essence, be called on to separate justifications grounded in the purposes of the Act from the footdragging efforts of a delinquent agency.

■ A federal equity court may exercise its discretion to give or withhold its mandate in furtherance of the public interest, including specifically the interest in effectuating the congressional objective incorporated in regulatory legislation.[107] We think the court may forebear the issuance of an order in those cases where it is. convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities.[108]

The sound discretion of an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him "to do an impossibility." [109]

■ Similar considerations apply after the issuance of an order when the defendant petitions for modification or the court considers the propriety of resorting to contempt to coerce compliance. "Flexibility rather than rigidity has distinguished" equity jurisprudence.[110] It would be unreasonable and unjust to hold in contempt a defendant who demonstrated that he was powerless to comply.[111] An equity court can never exclude claims of inability to render absolute performance, but it must scrutinize such claims carefully since officials may seize on a remedy made available for extreme illness and promote it into the daily bread of convenience.

Although this case has been given expedited consideration by this court, our declaration of the Administrator's primary duty under section 304(b)(1)(A) issues on the eve of the deadline for performance. We have molded our order to

sultants for each point source category for which guidelines are being developed. EPA's solicitation of comments from states, federal agencies, environmental groups, and industrial associations on the preliminary technical analyses provides the agency with time to give close consideration to matters raised in the comments and enables the agency to isolate issues which deserve further examination at the time when proposed guidelines are published. We believe that this two-stage process employed in the formulation of effluent limitation guidelines underscores EPA's commitment to the development of sound guidelines. *See* Effluent Limitations Guidelines and Standards for New Sources, Advance Notice of Public Review Procedures, 38 Fed.Reg. 21202–06 (1973).

**106.** *See* System Federation No. 91, Ry. Employees v. Wright, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961) ("There is also no dispute but that a sound judicial discretion may call for the modification of the terms of an injunctive decree if the circumstances . . . have changed, or new ones have since arisen."); United States v. Swift & Co., 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed.'

999 (1932) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.").

**107.** *See, e. g.*, Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); Hecht v. Bowles, 321 U.S. 321, 329–330, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Virginian Ry. v. System Fed'n No. 40, Ry. Employees Dept., 300 U.S. 515, 550–552, 57 S.Ct. 592, 81 L.Ed. 789 (1937).

**108.** *See* Hecht Co. v. Bowles, *supra* note 107.

**109.** *See* Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

**110.** Hecht Co. v. Bowles, *supra* note 107, 321 U.S. at 329, 64 S.Ct. at 592.

**111.** *See* Maggio v. Zeitz, *supra* note 109, 333 U.S. at 72–73 and n. 6, 68 S.Ct. 401; *cf.* Brotherhood of Locomotive Firemen v. Bangor & Aroostook R.R., 127 U.S.App.D.C. 23, 35, 380 F.2d 570, 582, cert. denied, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967). *See also* 17 Am.Jur.2d Contempt § 51 (1964); 42 Am.Jur.2d Injunctions § 340 (1969).

take account of this unusual situation in an attempt to do justice under the circumstances of this case.[112] Our order amounts to this. The Administrator is to publish section 304(b)(1)(A) guidelines by December 31, 1974. In the event that he makes a determination that, under the principles set forth in this opinion, a guideline should not be published for a particular category (or categories), or alternatively determines that a guideline is appropriate but that it is not feasible to meet the December 31, 1974 deadline, he may petition the District Court for a modification of the mandate and for a stay, pending disposition of the petition for modification, of the December 31 deadline for the categories involved. Our mandate contemplates that any such motion for stay will be granted pending the decision on the merits of the modification request. This ruling reflects our awareness of the need for administrative protection pending the determination of the petition for modification, and our confidence that the Administrator will make a good faith effort to discharge his primary duty and will petition for modification only in cases of genuine need. We take into account the Administrator's substantial compliance with the timetable for publication of Group I guidelines. We also contemplate that any ruling on a petition for modification will delay its effective date two weeks to permit petition to this court for extraordinary relief.

If relief is granted by the court, the issue of any shortfall in performance by the agency will become a matter for discussion within the pertinent committees and bodies of the legislature. The court will have done all that the legislature could fairly have contemplated from the judicial function of assuring executive compliance with the legislative mandate.[113]

We need not determine whether the general duty to publish effluent guidelines for nonsection 306 source categories by December 31, 1974, comes within the nondiscretionary duties covered by section 505(a)(2) of the Act or is more appropriately subject to court challenge under the Administrative Procedure Act as an abuse of discretion or an agency action unreasonably delayed. The distinction between these approaches tends to be abstract and conceptual. In light of our resolution of the jurisdictional issue in part I of this opinion, we will leave the parsing out of the lines separating these approaches to a later case in which the question is fully briefed and its resolution is required.

Reversed in part and remanded for further proceedings consistent with this opinion.

## APPENDIX A

### Federal Water Pollution Control Act Amendments of 1972

Section 301(a)&(b), 33 U.S.C. §§ 1311 (a)&(b)

§ 1311. Effluent limitations—Illegality of pollutant discharges except in compliance with law

(a) Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

Timetable for achievement of objectives

(b) In order to carry out the objective of this chapter there shall be achieved—

(1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly owned treatment works which meets

---

112. *See* 28 U.S.C. § 2106 (1970).

113. *See* National Automatic Laundry and Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 281, 443 F.2d 689, 696 (1971).

the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

(B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this title; or,

(C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter.

(2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point sources, other than publicly owned treatment works, which (i) shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section 1325 of this title), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant

to section 1314(b)(2) of this title, or (ii) in the case of the introduction of a pollutant into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, shall require compliance with any applicable pretreatment requirements and any other requirement under section 1317 of this title; and

(B) not later than July 1, 1983, compliance by all publicly owned treatment works with the requirements set forth in section 1281(g)(2)(A) of this title.

Section 304(b), 33 U.S.C. § 1314(b)

§ 1314. Information and guidelines—Criteria development and publication

Effluent limitation guidelines

(b) For the purpose of adopting or revising effluent limitations under this chapter the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, published within one year of October 18, 1972, regulations, providing guidelines for effluent limitations and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall—

(1)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources (other than publicly owned treatment works); and

(B) specify factors to be taken into account in determining the control measures and practices to be applicable to point sources (other than publicly owned treatment works) within such categories or classes. Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b)(1) of section 1311 of this title shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be

achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate;

(2)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best control measures and practices achievable including treatment techniques, process and procedure innovations, operating methods, and other alternatives for classes and categories of point sources (other than publicly owned treatment works); and

(B) specify factors to be taken into account in determining the best measures and practices available to comply with subsection (b)(2) of section 1311 of this title to be applicable to any point source (other than publicly owned treatment works) within such categories or classes. Factors relating to the assessment of best available technology shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate; and

(3) identify control measures and practices available to eliminate the discharge of pollutants from categories and classes of point sources, taking into account the cost of achieving such elimination of the discharge of pollutants.

Section 306(b)(1)(A), 33 U.S.C. § 1216(b)(1)(A)

Categories of sources; Federal standards of performance for new sources

(b)(1)(A) The Administrator shall, within ninety days after October 18, 1972, publish (and from time to time thereafter shall revise) a list of categories of sources, which shall, at the minimum, include:

pulp and paper mills;
paperboard, builders paper and board mills;
meat product and rendering processing;
dairy product processing;
grain mills;
canned and preserved fruits and vegetables processing;
canned and preserved seafood processing;
sugar processing;
textile mills;
cement manufacturing;
feedlots;
electroplating;
organic chemicals manufacturing;
inorganic chemicals manufacturing;
plastic and synthetic materials manufacturing;
soap and detergent manufacturing;
fertilizer manufacturing;
petroleum refining;
iron and steel manufacturing;
nonferrous metals manufacturing;
phosphate manufacturing;
steam electric powerplants;
ferroalloy manufacturing;
leather tanning and finishing;
glass and asbestos manufacturing;
rubber processing; and
timber products processing.

Section 402, 33 U.S.C. § 1342

§ 1342. National pollutant discharge elimination system—Permits for discharge of pollutants.

(a)(1) Except as provided in sections 1328 and 1344 of this title, the Adminis-

trator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, upon condition that such discharge will meet either all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

(4) All permits for discharges into the navigable waters issued pursuant to section 407 of this title, shall be deemed to be permits issued under this title, and permits issued under this title shall be deemed to be permits issued under section 407 of this title, and shall continue in force and effect for their term unless revoked, modified, or suspended in accordance with the provisions of this chapter.

(5) No permit for a discharge into the navigable waters shall be issued under section 407 of this title after October 18, 1972. Each application for a permit under section 407 of this title, pending on October 18, 1972, shall be deemed to be an application for a permit under this section. The Administrator shall authorize a State, which he determines has the capability of administering a permit program which will carry out the objective of this chapter, to issue permits for discharges into the navigable waters within the jurisdiction of such State. The Administrator may exercise the authority granted him by the preceding sentence only during the period which begins on October 18, 1972, and ends either on the ninetieth day after the date of the first promulgation of guidelines required by section 1314(h)(2) of this title, or the date of approval by the Administrator of a permit program for such State under subsection (b) of this section, whichever date first occurs, and no such authorization to a State shall extend beyond the last day of such period. Each such permit shall be subject to such conditions as the Administrator determines are necessary to carry out the provisions of this chapter. No such permit shall issue if the Administrator objects to such issuance.

### State permit programs

(b) At any time after the promulgation of the guidelines required by subsection (h)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each such submitted program unless he determines that adequate authority does not exist:

(1) To issue permits which—

(A) apply, and insure compliance with, any applicable requirements of sections 1311, 1312, 1316, 1317, and 1343 of this title;

(B) are for fixed terms not exceeding five years; and

(C) can be terminated or modified for cause including, but not limited to, the following:

(i) violation of any condition of the permit;

(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

(D) control the disposal of pollutants into wells;

(2)(A) To issue permits which apply, and insure compliance with, all applicable requirements of section 1318 of this title, or

(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 1318 of this title;

(3) To insure that the public, and any other State the waters of which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 1316 of this title if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 1311 of this title if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 1284(b), 1317, and 1318 of this title.

### Suspension of federal program upon submission of State program; withdrawal of approval of State program

(c)(1) Not later than ninety days after the date on which a State has submitted a program (or revision thereof) pursuant to subsection (b) of this section, the Administrator shall suspend the issuance of permits under subsection (a) of this section as to those navigable waters subject to such program unless he determines that the State permit program does not meet the requirements of subsection (b) of this section or does not conform to the guidelines issued under section 1314(h)(2) of this title. If the Administrator so

determines, he shall notify the State of any revisions or modifications necessary to conform to such requirements or guidelines.

(2) Any State permit program under this section shall at all times be in accordance with this section and guidelines promulgated pursuant to section 1314(h)(2) of this title.

(3) Whenever the Administrator determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program. The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

### Notification of Administrator

(d)(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit as being outside the guidelines and requirements of this chapter.

(3) The Administrator may, as to any permit application, waive paragraph (2) of this subsection.

### Waiver of notification requirement

(e) In accordance with guidelines promulgated pursuant to subsection (h)(2) of section 1314 of this title the Administrator is authorized to waive the requirements of subsection (d) of this section at the time he approves a program pursuant to subsection (b) of this section for any category (including any class, type, or size within such category) of point sources within the State submitting such program.

### Point source categories

(f) The Administrator shall promulgate regulations establishing categories of point sources which he determines shall not be subject to the requirements of subsection (d) of this section in any State with a program approved pursuant to subsection (b) of this section. The Administrator may distinguish among classes, types, and sizes within any category of point sources.

### Other regulations for safe transportation, handling, carriage, storage, and stowage of pollutants

(g) Any permit issued under this section for the discharge of pollutants into the navigable waters from a vessel or other floating craft shall be subject to any applicable regulations promulgated by the Secretary of the department in which the Coast Guard is operating, establishing specifications for safe transportation, handling, carriage, storage, and stowage of pollutants.

### Violation of permit conditions; restriction or prohibition upon introduction of pollutant by source not previously utilizing treatment works

(h) In the event any condition of a permit for discharges from a treatment works (as defined in section 1292 of this title) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved, may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior

to the finding that such condition was violated.

### Federal enforcement not limited

(i) Nothing in this section shall be construed to limit the authority of the Administrator to take action pursuant to section 1319 of this title.

### Public information

(j) A copy of each permit application and each permit issued under this section shall be available to the public. Such permit application or permit, or portion thereof, shall further be available on request for the purpose of reproduction.

### Compliance with permits

(k) Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of sections 1319 and 1365 of this title, with sections 1311, 1312, 1316, 1317, and 1343 of this title, except any standard imposed under section 1317 of this title for a toxic pollutant injurious to human health. Until December 31, 1974, in any case where a permit for discharge has been applied for pursuant to this section, but final administrative disposition of such application has not been made, such discharge shall not be a violation of (1) section 1311, 1316, or 1342 of this title, or (2) section 407 of this title, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. For the 180-day period beginning on October 18, 1972, in the case of any point source discharging any pollutant or combination of pollutants immediately prior to such date of enactment which source is not subject to section 407 of this title, the discharge by such source shall not be a violation of this chapter if such a source applies for a permit for discharge pursuant to this section within such 180-day period.

Section 505, 33 U.S.C. § 1365

§ 1365. Citizen suits—Authorization; jurisdiction

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

### Notice

(b) No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

Venue; intervention by Administrator

(c)(1) Any action respecting a violation by a discharge source of an effluent standard or limitation or an order respecting such standard or limitation may be brought under this section only in the judicial district in which such source is located.

(2) In such action under this section, the Administrator, if not a party, may intervene as a matter of right.

Litigation costs

(d) The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

Statutory or common law rights
not restricted

(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

Effluent standard or limitation

(f) For purposes of this section, the term "effluent standard or limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; or (6) a permit or condition thereof issued under section 1342 of this title, which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title).

Citizen

(g) For the purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely affected.

Civil action by State Governors

(h) A Governor of a State may commence a civil action under subsection (a) of this section, without regard to the limitations of subsection (b) of this section, against the Administrator where there is alleged a failure of the Administrator to enforce an effluent standard or limitation under this chapter the violation of which is occurring in another State and is causing an adverse effect on the public health or welfare in his State, or is causing a violation of any water quality requirement in his State. June 30, 1948, c. 758, Title V, § 505, as added Oct. 18, 1972, Pub.L. 92–500, § 2, 86 Stat. 888.

APPENDIX B

Clear Air Amendments of 1970

1. Section 304, 42 U.S.C. 1857h–2

§ 1857h–2. Citizen suits—Establishment of right to bring suit

(a) Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agen-

cy to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an. emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be.

### Notice

(b) No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right.

(2) under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of section 1857c–7(c)(1)(B) of this title or an order issued by the Administrator pursuant to section 1857c–8(a) of this title. Notice under

this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

### Venue; intervention by Administrator

(c)(1) Any action respecting a violation by a statutory source of an emission standard or limitation or an order respecting such standard or limitation may be brought only in the judicial district in which such source is located.

(2) In such action under this section, the Administrator, if not a party, may intervene as a matter of right.

### Award of costs; security

(d) The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

### Non-restriction of other rights

(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

### Definition

(f) For purposes of this section, the term "emission standard or limitation under this chapter" means—

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard, or

(2) a control or prohibition respecting a motor vehicle fuel or fuel additive,

which is in effect under this chapter (including a requirement application by

reason of section 1857f of this title) or under an applicable implementation plan.

2. *Legislative History of Section 304*

### CONFERENCE REPORT

H.R.Rep.No. 91–1783, at 55–56; Legislative History at 205–06.

### SECTION 304. CITIZEN SUITS

The House bill did not include a provision for citizen suits. The Senate amendment authorized citizen suits against violators, government agencies, and the Administrator to seek abatement of such violations or for enforcement of the provisions of the Act. Notice of thirty days was required except in certain instances. Discretionary authority was provided to the court to grant reasonable attorney and expert witness fees. Other rights to seek enforcement of standards under other provision of law were not affected.

The conference substitute retains provisions for citizen suits with certain limitations. Suits against the Administrator are limited to alleged failure to perform mandatory functions to be performed by him. Suits against violators, including the United States and other government agencies to the extent permitted by the Constitution, would also be authorized. Prior to commencing any action in the district courts, the plaintiff must have provided the violator, the Administrator and the State with sixty days' notice. If an abatement action is pending and is being diligently pursued in a United States or State court, such action cannot be commenced but any party in interest may intervene as a matter of right.

No delay following notice is required where there is an alleged violation of a hazardous emission standard or of an order of the Administrator. The conference substitute also provides that actions respecting violations by stationary sources are to be brought in the district in which the source is located and establishes that, in any action, the Administrator may intervene as a matter of right.

The courts' discretionary authority to award costs, as provided in the Senate amendment, is retained. In addition the Courts' discretionary authority to require filing of bond if a temporary restraining order or preliminary injunction is sought is noted.

The right of persons (or class of persons) to seek enforcement or other relief under any statute or common law is not affected.

### SENATE COMMITTEE REPORT

S.Rep.No. 91–1196 at 36–39; Legislative History at 436–39.

### SECTION 304. CITIZEN SUITS

The Committee has established a provision in the bill that would provide citizen participation in the enforcement of standards and regulations established under this Act. The provision in the proposed bill is carefully restricted to actions where violations of standards and regulations or a failure on the part of officials to act are alleged.

Section 304 would not substitute a "common law" or court-developed definition of air quality. An alleged violation of an emission control standard, emission requirement, or a provision in an implementation plan, would not require reanalysis of technological or other considerations at the enforcement stage. These matters would have been settled in the administrative procedure leading to an implementation plan or emission control provision. Therefore, an objective evidentiary standard would have to be met by the citizen who brings an action under this section.

Government initiative in seeking enforcement under the Clean Air Act has been restrained. Authorizing citizens to bring suits for violations of standards should motivate governmental agencies charged with the responsibility to bring enforcement and abatement proceedings.

In order to further encourage and provide for agency enforcement, the Committee has added a requirement that prior to filing a petition with the court, a citizen or group of citizens would first

have to serve notice of intent to file action on the Federal and State air pollution control agency and the alleged pollutor. Each citizen or group would have to include facts in such notice in accordance with regulations prescribed by the Secretary. The Secretary should prescribe such regulations as soon as possible after enactment, and such regulations should reflect simplicity, clarity, and standardized form. The regulations should not require notice that places impossible or unnecessary burdens on citizens but rather should be confined to requiring information necessary to give a clear indication of the citizens' intent. These regulations might require information regarding the identity and location of alleged pollutor, a brief description of the activity alleged to be in violation, and the provision of law alleged to be violated.

The Committee has provided a period of time after notice before a citizen may file an action. The time between notice and filing of the action should give the administrative enforcement office an opportunity to act on the alleged violation.

It should be emphasized that if the agency had not initiated abatement proceedings following notice or if the citizen believed efforts initiated by the agency to be inadequate, the citizen might choose to file the action. In such case, the courts would be expected to consider the petition against the background of the agency action and could determine that such action would be adequate to justify suspension, dismissal, or consolidation of the citizen petition. On the other hand, if the court viewed the agency action as inadequate, it would have jurisdiction to consider the citizen action notwithstanding any pending agency action.

The Committee emphasizes that if the alleged violation is a failure to comply with an administrative enforcement order, a violation of a standard of performance, or a prohibition or emission standard, there would be no waiting period following notice. It is the Committee's intent that enforcement of these control provisions be immediate, that citizens should be unconstrained to bring these actions, and that the courts should not hesitate to consider them.

Section 304 would provide that a citizen enforcement action might be brought against an individual or a government agency. As recognized under section 118 of the bill, Federal facilities generate considerable air pollution. Since Federal agencies have been notoriously laggard in abating pollution and in requesting appropriations to develop control measures, it is important to provide that citizens can seek, through the courts, to expedite the government performance specifically directed under section 118.

The standards for which enforcement would be sought either under administrative enforcement or through citizen enforcement procedures are the same.

The participation of citizens in the courts seeking enforcement of air quality standards should not result in inconsistent policy. The Clean Air Act should achieve objective standards against which to measure air quality. There should be no inconsistency in the enforcement of such standards. Whether abatement were sought by an agency or by a citizen, there would be a considerable record available to the courts in any enforcement proceeding resulting from the Federal and State administrative standard-setting procedures. Consequently, the factual basis for enforcement of standards would be available at the time enforcement is sought, and the issue before the courts would be a factual one of whether there had been compliance.

The information and other disclosure obligations required throughout the bill are important to the operation of this provision. The Secretary would have a special duty to make meaningful information on emitting sources available to the public on a timely basis.

The provision is drawn to avoid problems raised by class action provision of the Federal Rules of Civil Procedure,

specifically by Rule 23. Section 304 does not authorize a "class action." Instead, it would authorize a private action by any citizen or citizens acting on their own behalf. Questions with respect to traditional "class" actions often involve: (1) identifying a group of people whose interests have been damaged; (2) identifying the amount of total damage to determine jurisdiction qualification; and (3) allocating any damages recovered. None of these points is appropriate in citizen suits seeking abatement of violations of air quality standards. There would be no jurisdictional amount required in section 304 nor is there any provision for the recovery of property or personal damages. It should be noted, however, that the section would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. Compliance with standards under this Act would not be a defense to a common law action for pollution damages.

Concern was expressed that some lawyers would use section 304 to bring frivolous and harassing actions. The Committee has added a key element in providing that the courts may award costs of litigation, including reasonable attorney and expert witness fees, whenever the court determines that such action is in the public interest. The court could thus award costs of litigation to defendants where the litigation was obviously frivolous or harassing. This should have the effect of discouraging abuse of this provision, while at the same time encouraging the quality of the actions that will be brought.

The Courts should recognize that in bringing legitimate actions under this section citizens would be performing a public service and in such instances the courts should award costs of litigation to such party. This should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict. For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions.

Enforcement of pollution regulations is not a technical matter beyond the competence of the courts. The citizen suit provision is consistent with principles underlying the Clean Air Act, that is the development of identifiable standards of air quality and control measures to implement such standards. Such standards provide manageable and precise benchmarks for enforcement.

The Committee bill would provide in the citizen suit provision that actions will lie against the Secretary for failure to exercise his duties under the Act, including his enforcement duties. The Committee expects that many citizen suits would be of this nature, since such suits would reduce the ultimate burden on the citizen of going forward with the entire action.

Senate Committee Report, Section by Section Analysis S.Rep.No. 91–1196, at 64–65; Legislative History at 464–65.

*Section 304*

This new section provides jurisdiction in the Federal district courts, without regard to the citizenship of the parties or the amount of controversy, to hear and decide civil actions instituted by any citizen or class of citizen to enforce or require enforcement of certain provisions of the Clean Air Act, including: any applicable schedule or timetable compliance, emission requirement, standard of performance, emission standard, or prohibition established under the Act. The actions may be brought against any person, as that term is defined in section 302(e) of the Act, where there is an alleged violation of any of its provisions, or against the Secretary where he fails to enforce any standards or orders established under the Act or to compel him to exercise any duty imposed on him under the Act.

The section does not, however, affect in any way whatever remedies such citizens or class of citizens might have under statutory or other law, nor does it provide for damage or nuisance actions.

Before instituting a citizen action to abate a violation, however, the petition must give notice to the Secretary, his representative, if any, the appropriate State agency, and the violator of the violation and allow at least 30 days thereafter to permit them to abate the violation. If the Secretary, his representative, or a State does institute proceedings to abate within this time, they must prosecute them in good faith and with deliberate speed to meet this notice requirement or the citizen is free to initiate his action. Actions to abate a violation of an order or certain specified provisions may be instituted without such notice. If the Secretary is not a party to the proceeding, he may intervene.

The court may award costs of litigation to either party whenever the court determines such an award is in the public interest without regard to the outcome of the litigation.

*Debates*

\* \* \* \* \* \*

[Mr. Muskie] Dec. 18, 1970, Legislative History at 127.

The bill extended the concept of public participation to the enforcement process. The citizen suits [Sec. 304] authorized in this legislation would apply important pressure. Although the Senate did not advocate these suits as the best way to achieve enforcement, it was clear that they should be an effective tool.

Sept. 21, 1970, Legislative History at 277.

Mr. Hruska. Mr. President, it is not my purpose to get into any position that would be obstructive. Frankly, inasmuch as this matter came to my attention for the first time not more than 6 hours ago, it is a little difficult to order one's thoughts and to decide the best course of action to follow.

Had there been timely notice that this section was in the bill, perhaps some Senators would have asked that the bill be referred to the Committee on the Judiciary for consideration of the implica-

tions for our judicial system. As was the case in the consumers class action bill, this section deals with an area of governmental function which is under the jurisdiction of that committee.

I am aware of the situation which confronts us. We want to go home to campaign. We want to get out of the Senate and either adjourn sine die before the election or return after the election. I understand the emotional appeal of the bill. I know of its intent. I know all these things are true. But if in the process of taking action which might be ill-advised and would result in some of the backlash, as we might call it, that was foretold and forecast for us in the case of S. 3201, I wonder if it would not be better to make haste slowly.

What is the matter with that section? I have here a memorandum that was handed to me by a member of my staff. It outlines some of the basic objections that lie as objections to section 304.

The memorandum starts out this way:

S. 4358—THE CLEAN AIR ACT

Section 304, Citizens Suits

A. *The proposal is unprecedented in American history.*

1. The proposal is predicated on the erroneous assumption that officials of the Executive Branch of the United States Government will not perform and carry out their responsibilities and duties under the Clean Air Act. Never before in the history of the United States has the Congress proceeded on the assumption that the Executive Branch will not carry out the Congressional mandate, hence, private citizens shall be given specific statutory authority to compel such officials to do so.

2. The Hearings of the Public Works Committee do not provide either a factual or legal basis which would justify the adoption of this far-reaching and novel procedure wherein private citizens may challenge virtually every decision made by the officials of the Executive Branch in the carry-

ing out of the numerous complex duties and responsibilities imposed by the Clean Air Act.

Mr. President, that involves not only every decision but also every lack of a decision, which the Secretary may engage in for the purpose of implementing this act.

The memorandum further states:

B. *The adoption of Section 304 will result in a multiplicity of suits which will interfere with the Executive's capability of carrying out its duties and responsibilities.*

1. The Clean Air Act provides the regulatory agencies with ample powers to formulate standards and to secure effective enforcement of the regulations. There is no need to delegate enforcement powers, direct or indirect, to private citizens.

2. Section 304 is an open invitation to the institution of Citizens Suits— encouraged by the awarding of litigation expense "including reasonable attorney and expert witness fees. . ." (Section 304 (b)) This award may be granted even in a case where the actions "result in successful abatement but do not reach a verdict" (Report p. 38). A multiplicity of actions are sure to follow the enactment of Section 304 regardless of how well the regulatory agencies perform their duties and responsibilities.

Mr. President, I might add that the agency might not be at fault if it does not act promptly or does not enforce the act as comprehensively and as thoroughly as it would like to do. Some of its capabilities depend on the wisdom of the appropriations process of this Congress.

It would not be the first time that a regulatory act would not have been provided with sufficient funds and manpower to get the job done.

I need refer only to the very recent, classic example brought up in the case of the class action Packer Stockyard Act of 1940, where for decades the provisions of the act were not capable of enforcement,

Congress—whether deliberately or not— continually and repeatedly refused to provide the funds and manpower necessary to enforce the provisions of that act.

Notwithstanding the lack of capability to enforce this act, suit after suit after suit could be brought. The functioning of the department could be interfered with, and its time and resources frittered away by responding to these lawsuits. The limited resources we can afford will be needed for the actual implementation of the act.

Sept. 21, 1970, Legislative History at 280–81.

Mr. Muskie.

Mr. President, I think it is important to note the limitations written into this provision of the bill by the committee that are noted in the section of the committee report which I have just inserted in the record.

First of all, the section does not presume that there will be a lack of good will or good faith or dedication on the part of those administering the provisions of the law in doing so.

What we are seeking to establish is a nationwide policy. National ambient air standards implemented by plans developed at the State and local level create potentially enormous enforcement problems for State, local, and regional governments, as well as for the National Government. I think it is too much to presume that, however well staffed or well intentioned these enforcement agencies, they will be able to monitor the potential violations of the requirements contained in all the implementation plans that will be filed under this act, all the other requirements of the act, and the responses of the enforcement officers to their duties.

Citizens can be a useful instrument for detecting violations and bringing them to the attention of the enforcement agencies and courts alike. So we have provided this restrictive citizen suit provision for that purpose. We took testimony on this subject. It was strongly

supported by legal scholars and several organizations. The provision, as finally written into the bill, is considerably cut down from some of the proposals that were advanced. It is not a class-action provision.

These features might be of interest:

First of all, a citizen suit can be brought only to enforce the provisions of the act or the requirements that are established as a result of the operations of the act. In other words, a citizen suit is limited to the right to seek the enforcement of the provisions of the act.

Second, before bringing suit, there is a requirement in this provision that the citizen bring his intention to bring suit to the attention of the local enforcement agency, the thought being that he might trigger administrative action to get the relief he might otherwise seek in the courts.

I think most citizens, if they were able to trigger such administrative action, would be satisfied with having done so. Thus, they would have done nothing more than the act anticipates—that is, the full and effective enforcement of the provisions of the law.

In those instances where enforcement was not triggered, that is, enforcement action by the administrative agency was not triggered, then it seemed to us the citizen ought to be able to pursue the judicial remedy.

The Senator from Nebraska raised the question of possible harassing suits by citizens. This the committee attempted to discourage by providing that the costs of litigation—including counsel fees— may be awarded by the courts to the defendants in such cases, so that the citizen who brings a harassing suit is subject not only to the loss of his own costs of litigation, but to the burden of bearing the costs of the parties against whom he has brought the suit in the first instance.

I doubt very much that individual citizens would lightly engage this possibility.

These are some of the points it seemed to me ought to be brought to the attention of the Senate, in the light of the remarks made by the distinguished senator from Nebraska. Other points are covered by the section of the committee report which I have asked to be included in the Record.

Sept. 22, 1970, Legislative History at 355–57.

Mr. Hart. Mr. President, I would like to address myself at this time to section 304 of S. 4358, the citizen suit provision of the bill. I regard this provision as one of the most attractive features of the bill and am therefore disturbed by criticism of it which has been offered both within and without this Chamber.

The basic argument for the provision is plain: namely, the Government simply is not equipped to take court action against the numerous violations of legislation of this type which are likely to occur. In testifying on a similar bill before the Senate Subcommittee on Energy, Natural Resources and the Environment, former Attorney General Ramsey Clark spoke convincingly of this inevitable incapability. Mr. Clark stated:

It will be impossible for government enforcement to control all significant acts of pollution . . . The extension of private right . . . and effective sanctions for the persons directly affected or concerned will be essential if vital interests are to be protected. Our experience in areas of massive unlawful racial discrimination, such as in schooling, employment, and housing tells us that however hard it might try, government will never have the manpower, the techniques, or the awareness necessary to enforce the law for all. Private enforcement of those laws is the only way the individual can be assured that the rights cannot be violated with impunity.

Pollution control is another such area. If we are really serious about controlling the quality of our environment before it destroys the quality of our lives, we must give the individuals affected by, or concerned about pollutions in his life, the power to stop them through legal process.

Far risking an undue or inhibiting interference with Government enforcement, it will provide powerful supplementary enforcement . . . and an effective and desirable prod to officials to do their duty.

It has been argued, however, that conferring additional rights on the citizen may burden the courts unduly. I would argue that the citizen suit provision of S. 4358 has been carefully drafted to prevent this consequence from arising. First of all, it should be noted that the bill makes no provision for damages to the individual. It therefore provides no incentives to suit other than to protect the health and welfare of those suing and others similarly situated. It will be the rare, rather than the ordinary, person, I suspect, who, with no hope of financial gain and the very real prospect of financial loss, will initiate court action under this bill. For the most part, only in the case where there is a crying need for action will action in fact be likely. In such cases, I would argue that action must be in the public interest.

The bill also provides for a notice requirement to State and Federal pollution agencies prior to the bringing of suit. [Sec. 304(a)(3)] This requirement, it is expected, will have the effect of prodding these agencies to act. In many cases, it is hoped, they will be able to act without resorting to the courts.

Even if litigation is in fact expanded under this bill, it must still be contended that such expansion is justifiable. As Ramsey Clark also stated at the hearings previously referred to:

> There is no question that justice is denied in America because it is delayed, and court backlogs are a serious problem for society from every standpoint. But society has to have priorities and survival should be a pretty high priority. Survival depends upon the protection of our environment, and I think legal redress in America will be a major method of protecting that environment. The imposition of any additional caseload that might follow

from this bill on the courts is one that it must gladly assume.

It may be that our judicial system must be expanded to provide for this caseload. Or it may be, as Mr. Clark states, that we may have to adjust the priorities within that system. The time perhaps has come to take major action to compel that adjustment. It is in part for that reason that some have suggested the elimination of threshold procedural defenses that consume a court's time enroute to its examination of the merits of cases. And it is in part for that reason that some have suggested an end to the fault principle that monopolizes so much time in automobile accident litigation.

It has been argued that even if the courts can meet the burden of cases arising under this bill, defendants may be unduly harassed by frivolous suits which may be brought. The bill defends this criticism by providing that the court "may award costs of litigation, including reasonable attorney and expert witness fees, whenever the court determines such action is in the public interest." Given the escalating costs of attorneys fees today, I find it difficult to imagine that many will engage in the frivolity which appears so worrisome to some.

Yesterday, the distinguished Senator from Nebraska (Mr. Hruska) referred to Chief Justice Burger's remarks about the dangers inherent in providing additional rights of action enforceable in Federal courts.

I am aware of the Chief Justice's caution in this area, and I believe it to be soundly based. However, I would remind my colleagues of another cautionary remark to which he referred in one of his opinions, namely, Office of Communication of United Church of Christ v. FCC, [123 U.S.App.D.C. 328] 359 F.2d 994 (1966). In that opinion referring to the right of citizens to appear before the FCC, he cited with approval a statement of the late Edmond Cahn, which reads:

> Some consumers need bread; others need Shakespeare; others need their

rightful place in the national society—what they all need is processors of law who will consider the people's needs more significant than administrative convenience.

It is my hope that both we and those administratively our judicial system will take heed of that advice and continue to be guided by it.

Mr. President, I was off the floor when the Senator from Kentucky made his remarks and I may not be responding to what was said.

I would make this point, however, relative to the specific issue now before the Senate.

In legislation of this type, we will find very likely noncompliance which in number or degree are far beyond the capacity of the Government to respond to. This is one of the frustrations.

We do not have to serve on commissions such as the Commission on Civil Disorders or Violence or anything else to know that one of the frustrations across this country is the increasing number of our citizens who feel that Congress has made them a promise, but that there are no means of obtaining delivery on that promise.

The burden on the Department of Justice is so great that the agency cannot respond to it. To allow the citizen the right to sue on his own behalf may indeed increase the burden on the Federal courts. But this is not an adequate response to the frustrated citizen who seeks that right.

Our obligation, I feel, is to bear that burden by expanding the capacity of the court system to respond to the frustrated citizens.

\* \* \* \* \* \*

[Mr. Cooper] Sept. 22, 1970, Legislative History at 387.

The committee bill also breaks new ground in extending public participation, an essential element throughout the act, to enforcement proceedings. In Section 304, the bill proposes to grant jurisdiction to the Federal district courts to hear charges of violations of particular provisions of the act brought by citizens acting in their own behalf. As originally proposed the provision troubled me with respect to its impact on administrative enforcement efforts and, of course, on the courts. During its consideration the committee made particular efforts to draft a provision that would not reduce the effectiveness of administrative enforcement, and not cause abuse of the courts while at the same time still preserving the right of citizens to such enforcement of the act.

The citizen suit provision [Sec. 304] has developed in a context of other proposals authorizing citizen access to the courts for environmental remedies at both the State and Federal level.

ROBB, Circuit Judge (dissenting):

Although I do not quarrel with the able discussion and resolution of the merits in the majority opinion I believe the District Court should have dismissed this action for want of jurisdiction.

Section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365 provides:

§ 1365. Citizen suits—Authorization; jurisdiction

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

\* \* \* \* \* \*

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

\* \* \* \* \* \*

Notice

(b) No action may be commenced—

\* \* \* \* \* \*

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator, . . ..

NRDC did not give the notice required by the statute; indeed at oral argument in this court counsel for NRDC stated that they purposely did not give notice because the giving of notice would have entailed a delay.

The notice requirement is plain and unequivocal and applies to this case, but the majority opinion in effect reads it out of the statute. In this I cannot concur.