.WILKINS, Circuit Judge:'
Ought implies can.[1] That is, in order for law—man-made or otherwise—to command the performance of an act; that act must be possible to perform. This lofty philosophical maxim, ordinarily relevant only to bright-eyed college freshmen, sums up our reasoning in this case.
*162 Congress established an administrative appeals process for denied Medicare reimbursement claims, and directed the U.S. Department of Health and Human Services (“HHS”) to complete that process within a specified timeframe. Buried under an ever-growing backlog of over a half-million appeals, HHS failed—and continues to fail—to comply with the statutorily mandated deadlines. Consequently, the American Hospital Association and three healthcare providers (together, “Healthcare Providers”) sought a mandamus order to force the HHS Secretary to clear the backlog and adhere to the statute’s time-frame. The District Court, in turn, thoughtfully and scrupulously weighed the equities, concluding that the scales tipped in favor of mandamus.
The District Court was then confronted with the unenviable task of defining the scope and substance of the mandamus order. In an effort to minimize the judiciary’s intrusion on the political branches’ prerogatives, the Court adopted an ends-oriented approach of setting targets for HHS to hit, leaving to the Secretary the choice of means for hitting those targets. But what were the appropriate targets to set? The Healthcare Providers proposed an ambitious four-year timetable. The Secretary criticized that timetable as impossible to achieve lawfully and potentially counterproductive, but offered no alternative. Lacking a competing proposal, the District Court adopted the timetable suggested by the Healthcare Providers. In doing so, however, the Court declined to seriously grapple with the Secretary’s assertion that lawful compliance with such a mandamus order would be impossible. That is, the Court commanded the Secretary to perform an act—clear the backlog by certain deadlines—without evaluating whether performance was possible. We conclude that, notwithstanding the District Court’s earnest efforts to make do with what the parties presented, the failure to seriously test the Secretary’s assertion of impossibility and to make a concomitant finding of possibility was an abuse of discretion. The Court declared that a party ought without regard for whether the party can.
I.
A.-
“Medicare provides federally funded health insurance to disabled persons and those aged 65 or older .... ” Council for Urological Interests v. Burwell, 790 F.3d 212, 215 (D.C. Cir. 2015) (discussing 42 U.S.C. §§ 1395 et seq.). After a healthcare provider (e.g., a hospital) performs a service it believes is covered by Medicare, it submits a claim for reimbursement to the Centers for Medicare and Medicaid Services, an agency within HHS. 42 U.S.C. §§ 1395ff(a)(1)-(2), 1395kk-1(a); 42 C.F.R. §§ 405.904(a)(2), 405.920-405.928. When a provider is denied reimbursement, or is otherwise “dissatisfied” with the initial determination, it is entitled to a four-level administrative appeals process, followed by judicial review. See generally 42 U.S.C. § 1395ff. We previously described the process in greater detail. See Am. Hosp. Ass’n v. Burwell, 812 F.3d 183, 185-87 (D.C. Cir. 2016) (hereinafter, “AHA I”).
From start to finish, the administrative appeals process is designed to take less than one year. To keep things moving, the statute sets specific time frames for each of the four levels of the process: sixty days for the first level, 42 U.S.C. § 1395ff(a)(3)(C)(ii); another sixty days for the second level, id. § 1395ff(c)(3)(C)(i); ninety days for the third level, id. § 1395ff(d)(l)(A); and another ninety days for the fourth level, id. § 1395ff(d)(2)(A). “For years, the administrative appeal process functioned largely as anticipated, with its various stages typically completed with *163 in the statutory time frames.” AHA I, 812 F.3d at 186 (citing Am. Hosp. Ass’n v. Burwell, 76 F.Supp.3d 43, 46 (D.D.C. 2014)).
But starting in fiscal year 2011, an unexpected and dramatic uptick in appeals produced a jam in the process. The uptick was attributable to multiple causes, including “a large increase in the number of new beneficiaries as members of the 'baby boom’ generation began to reach 65 and become eligible for Medicare,” and “a growing sense, among at least some members of the provider community, that it is a good business practice to appeal every denied claim.” Decl. of Ellen Murray, Chief Fin. Officer of the Dep’t of Health and Human Servs., J.A. 91-92. Furthermore, as we stressed in our previous decision, much of the increased workload -can be traced back to the congressionally mandated Medicare Recovery Audit Program. AHA I, 812 F.3d at 186-87. Under that program, recovery audit contractors (“RACs”) would review reimbursement claims that have already been paid, “identify! ] underpayments and overpayments,” and “recoup!] overpayments.” 42 U.S.C. § 1395ddd(h)(l). When a RAC flags an overpayment, the healthcare provider could either repay the difference or appeal the RAC’s decision through the four-level administrative appeals process, as though the claim were denied at the outset. Id. § 1395ddd(f)(2)(A). Instead of repaying the difference, many providers elected to avail themselves of the administrative process. After the program was implemented, “the number of appeals filed ballooned from 59,600 in fiscal year 2011 to more than 384,000 in fiscal year 2013.” AHA' I, 812 F.3d at 187.
As those appeals moved through the process, they piled up at the third level, where an administrative law judge (“ALJ”) reviews the matter de novo. Instead of waiting in line, providers stuck at the ALJ level may skip to the next, through a process called “escalation.” 42 U.S.C. § 1395ff(d)(3). But that choice comes at a cost: the provider must forfeit certain procedural rights, such as a hearing before an independent ALJ. Id. § 1395ff(d)(l), (2). Many claimants, therefore, have been reluctant to “escalate” their appeals, and the ALJ backlog continues to grow. As of June 2, 2017, there was a backlog of 607,402 appeals awaiting review at this level. Status Report of Def. Thomas Price at 2, No. 14-cv-851 (June 5, 2017), ECF No. 56. On its current course, the backlog is projected to grow to 950,520 by the end of fiscal year 2021, id., and “some already-filed claims could take a decade or more to resolve,” AHA I, 812 F,3d at 187. This is, of course, far outside the ninety-day timeframe set by statute. 42 U.S.C. § 1395ff(d)(l)(A).
B.
In 2014, the Healthcare Providers filed suit seeking a mandamus order to compel the HHS Secretary to clear the backlog and comply with the ninety-day statutory timeframe for ALJ hearings.
The Healthcare Providers moved for summary judgment, and the Secretary simultaneously moved to dismiss for lack of subject-matter jurisdiction. Am. Hosp. Assoc. v. Burwell, 76 F.Supp.3d 43, 45 (D.D.C. 2014). The District Court first grappled with whether it faced a jurisdictional question—i.e., whether, pursuant to 28 U.S.C. § 1361, the threshold mandamus requirements were met, United States v. Monzel, 641 F.3d 528, 534 (D.C. Cir. 2011)—or a merits question—ie., whether mandamus would be equitable, Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984). The Court concluded that the jurisdictional and equitable merits inquiries were one and the same (“merged”), and so resolved the summary *164 judgment and dismissal motions together. Am. Hosp. Assoc.,. 76 F.Supp.3d at 49-50, Based on this merged analysis, the District Court granted the Secretary’s motion to dismiss, reasoning that “HHS’s budgetary constraints, its competing priorities, and its incipient efforts to resolve the issue together dictate that mandamus is not warranted.” Id. at 56. “Congress,” furthermore, was “aware of the situation and [was] in a position to address the problem.” Id.
On appeal, we reversed the District Court’s dismissal. AHA I, 812 F.3d at 194. We first clarified that “the distinction between the jurisdictional inquiry and the equitable merits inquiry matters, especially because it affects our standard of review.” Id. at 190. As for the jurisdictional inquiry, we held that the Healthcare Providers “ha[d] demonstrated that,, the threshold requirements for mandamus jurisdiction [were] met.” Id. at 192. We then left the equitable merits inquiry to the District Court to consider but,' in an effort to help guide the Court’s “difficult decision,” we “set out the factors that weigh most strongly for and against mandamus in this case.” Id. Counseling for mandamus, we highlighted the backlog’s real impact on human health and welfare, and, “critically to our thinking,” the Secretary’s substantial discretion over the RAC program, which contributed significantly to the backlog. Id. at 193. Counseling against mandamus, we highlighted the risk of “infringing on the authority and discretion of the executive branch;” the legislative branch’s awareness of the problem and its capacity to furnish a comprehensive solution; the Secretary’s incipient but good-faith efforts to reduce the backlog; and the availability of some, albeit incomplete, alternative relief in the form of “escalation.” Id. at 192-93. Ultimately, “the clarity of the statutory duty,” we remarked, “likely will require issuance of the writ if the political branches have failed to make meaningful progress within a reasonable period of time—say, the close of the next full appropriations cycle.”[2] Id, at 193.
On remand, the District Court balanced the equities to determine whether mandamus was appropriate. After considering our guidance regarding the factors that counseled for and against the writ’s issuance, the District Court evaluated the political branches’ progress—and potential for progress—toward a solution. But by the Court’s estimation, the current measures were unlikely to yield meaningful progress, and so it concluded that the equities weighed in favor of mandamus.' Having concluded that some relief was warranted, the District Court ordered further briefing and a status conference to determine the scope and substance of that relief.
The Healthcare Providers proposed two sets of options: either a means-oriented plan requiring the Secretary to take specific actions, or an ends-oriented plan setting a timetable for clearing the backlog. The District Court opted for a timetable, *165 reasoning that such an approach would “intrude as little as possible on the Secretary’s specific decisionmaking processes and operations.” Mem. Op. at 5, No. 14-851 (D.D.C. Dec. 5, 2016), ECF No. 48 (hereinafter, “Mandamus Op.”). Because it adopted the ends-oriented approach,- the Court believed that it “need[ed] not dive into the parties’ debate over” the means. Id.
Arguing against the Healthcare Providers’ proposed timetable, the Secretary advanced three contentions relevant here. First, although this Court indicated that curtailment or complete suspension of the RAC program would go a long way to clearing the backlog, AHA I, 812 F.3d at 193, the facts had since changed: few of the newly generated appeals were RAC-related. Second, since even dramatic changes to the RAC program would not enable compliance with the timetable, hitting the court-ordered targets would be impossible without settling unsubstantiated claims en masse, which the Secretary alleged would violate the Medicare statute. Third, the timetable would only exacerbate the backlog: hard deadlines would counter-productively incentivize claimants to file meritless appeals and hold out for settlement.
The District Court brushed aside the Secretary’s contentions. According to the Court, it “need[ed] not dive into the parties’ debate” over the “legality and propriety” of the reforms .necessary -to comply with the timetable, since it was not ordering any particular reforms. Mandamus Op. at 5. Furthermore, compliance with the timetable would not require violations of the Medicare statute, but rather “simply demanded] that the Secretary figure out how to undertake proper claim substantiation within a reasonable timeframe.” Id. (internal quotation marks omitted). •
Since the Secretary refused to engage with the premise of setting a timetable at all, proposing no alternative targets, the District' Court adopted the Healthcare Providers’ four-year plan: the Secretary was ordered to reduce the current backlog of cases pending at the ALJ level by 30% by December 31, 2017; 60% by December 31, 2018; 90% by December 31, 2019; and 100% by December 31,2020.
After filing an unsuccessful motion for reconsideration, the Secretary appealed the District Court’s order.
II.
“Our consideration of any mandamus petition ‘starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act,’ ” In re Core Commc’ns, Inc., 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting In re Bluewater Network, 234 F.3d 1305, 1315. (D.C. Cir. 2000)); accord Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002) (“The remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances.” (internal quotation marks omitted)).
We -previously explained that the decision to issue mandamus relief involved two distinct inquiries: one jurisdictional, and one regarding the equitable merits. AHA I, 812 F.3d at 190. In that previous appeal, we settled the former question, holding that the threshold requirements for mandamus jurisdiction were met, id. at 192, although one of our sister circuits has since thought otherwise, Cumberland Cnty. Hosp. Sys., Inc. v. Burwell, 816 F.3d 48, 52-57 (4th Cir. 2016). We, of course, do not revisit our previous conclusion regarding mandamus jurisdiction. See LaShawn A. v. Barry, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc) (“One three-judge panel *166 ... does not have the authority to overrule another three-judge panel.”).
Instead, we focus now on the equitable merits inquiry, along with the relief that the inquiry produced. We review this part of the District Court’s analysis for abuse of discretion. In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005). And “[a] district court by definition abuses its discretion when it makes an error of law.” Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).
We conclude that since the Secretary represented that lawful compliance with the mandamus order was impossible, it was an error of law, and therefore an abuse of discretion, to nonetheless order the Secretary to render that performance without first finding that lawful compliance was indeed possible.
Once the District Court determined that an ends-oriented approach of setting targets was the best course of action, it adopted the timetable proposed by the Healthcare Providers. Because it was mandating the ends, not the means, the Court believed that it “needled] not dive into the parties’ debate over” the “legality and propriety” of the reforms necessary to clear the backlog. Mandamus Op. at 5. But this was a misstep. Although true that the Court was mandating no particular reforms, the Secretary would, of course, need to adopt.some reforms to meet the mandated timetable. After all, that was the point of mandamus relief. But if, as the .Secretary insisted, no lawful reforms could be implemented to meet the timetable, then it was an error of law to order the timetable met.
The Secretary first contends that, given changing patterns in appeals, the tools within his discretion—most notably, curtailment or suspension of the RAC program—are not enough to clear the backlog. A major reason, according to the Secretary, is that the RAC program is no longer the.principal cause of the backlog: only 9.5% of new appeals in 2016 were RAC-related, compared to more than 50% in 2013 and 2014. Appellant’s Br. at 18.
This contention is, at best, suspect. Those statistics coincide with a two-year suspension of most of the RAC program, which was instituted while new contracts were being negotiated. See Suppl. Deck of Ellen Murray, Chief Fin. Officer of the Dep’t of Health and Human Servs., J.A. 140-41 (“RAC activity decreased temporarily while [the Centers for Medicare and Medicaid Services] was negotiating a new Statement of Work (SOW) with the RACs, but several other changes took place that are expected to make lasting and continuing reductions to RAC-related appeal receipts.”); see also U.S. Gov’t Accountability Office, GAO-16-366, Medicare Fee-for-Service: Opportunities Remain To Improve Appeals Process 38 n.64 (2016) (explaining that the RAC program was temporarily suspended); id. at 38 (“HHS reported that it expects the number of incoming appeals to increase again when the new [RAC] contracts are awarded and the [RAC] program resumes full operation.”). We are not sold on the Secretary’s suggestion that concerns regarding the RAC program are behind us, and the District Court should scrutinize that claim on remand.
We also share the District Court’s skepticism of the Secretary’s assertion that he has done all he can to reduce RAC-related appeals. As the Court explained, there are “around 300,000 RAC-related appeals pending ALJ review, which constituted a sizable portion—31%—of all pending ... appeals.” Mem. Op. at 13, No. 14-851 (D.D.C. Sept. 19, 2016), ECF No. 38. “Yet the only RAC-related action the Secretary reports to be undertaking or planning to *167 undertake consist of three modifications to RAC contracts that will reduce the number of appeals that reach [the ALJ level] by [fiscal year] 2020 by just 22,000.” Id. The Secretary’s RAC-related interventions appear to be curiously weak medicine for an agency facing mandamus.
Nevertheless, the record supports the Secretary’s principal contention that reform of the RAC program and other programmatic tweaks may not be enough. At oral argument, the Healthcare Providers conceded that ALJs currently have the capacity to review only about 90,000 appeals per year. Oral Arg. at 27:05, Am. Hosp. Assoc. v. Price (May 15, 2017) (No. 17-5018). Even in the years when the RAC program was temporarily suspended, HHS received between 200,000 and 250,000 appeals. Therefore, although more reforms of the RAC program may help, even a complete suspension is likely to leave an annual disposition gap of - over 100,000 appeals—appeals that will be piled onto the existing backlog, frustrating HHS’s efforts to comply with the statute’s timeframe and the Court’s mandamus order.
So what could the Secretary do to close the disposition gap and clear the backlog of over a half-million pending appeals? There appears to be ho dispute that mass settlements would play a central role. But the Secretary repeatedly insisted that the type of mass settlement necessary to comply with the Court’s timetable would be illegal. Specifically, the Secretary argued that the Healthcare Providers’ proposal required him “to make payment on Medicare claims regardless of the merit of those claims,” which would “squarely conflict with the Medicare statute.” Defi’s Mot. for Summ. J. at 23, No. 14-cv-851 (Nov. 7, 2016), ECF No. 41 (discussing 42 U.S.C. §§ 1895f, 1395g(a), 1395y(a)(l)(A)). The Court declined to seriously grapple with the Secretary’s contention, explaining matter-of-factly that the timetable “simply demands that the Secretary figure out how to undertake proper claim substantiation within a reasonable timeframe.” Mandamus Op. at 5 (internal quotation marks omitted). But that response gave short shrift to the Secretary’s proffer that “proper claim substántiation within a reasonable timeframe” was impossible.
The, Secretary essentially asserted that the timetable placed him between a rock and a hard place: either violate the Medicare statute by settling reimbursement claims en masse without regard for their merit, or violate the Court’s mandamus order by missing the court-ordered deadlines. By declining to evaluate the Secretary’s claims, the Court was, in effect, saying: “hit the targets by any means necessary.” But if the necessary means were unlawful, the Court could not have mandated them; equity courts, like any other, may not order parties to break the law. See INS v. Pangilinan, 486 U.S. 875, 883, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988) (“[I]t is well established that courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law.” (alterations and internal quotation marks omitted)).
But if only lawful reforms were implemented, the Secretary claimed, compliance with the timetable would be impossible. And just as a court may not require an agency to break the law, a court may not require an agency to render performance that is impossible. See Ala. Power Co. v. Costle, 636 F.2d 323, 359 (D.C. Cir. 1979); NRDC v. Train, 510 F.2d 692, 713 (D.C. Cir. 1974). A century ago, we explained that “[t]he writ of mandamus will not issue to compel the performance of that which cannot be legally accomplished.” United States ex rel. Newman v. City & Suburban Ry. of Wash., 42 App. D.C. 417, 420-21 (D.C. Cir. 1914). The rea *168 soning is simple and intuitive; it is not appropriate for a court—contemplating the equities—to order a party to jump higher, run faster, or lift more than she is physically capable.
This principle extends to cases where the impossibility is the result of insufficient congressional appropriations. See, e.g., Morton v. Ruiz, 416 U.S. 199, 230-31, 94 S.Ct. 1056, 39 L.Ed.2d 270 (1974) (recognizing that an agency may balance competing statutory commands to cope with insufficient appropriations); Ala. Power, 636 F.2d at 359 (same); Train, 510 F.2d at 710-14; see also In re Aiken Cnty., 725 F.3d 255, 259 (D.C. Cir. 2013) (“Under Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory mandates so long as there is appropriated money available and the President has no constitutional objection to the statute.” (emphasis added)). For example, in Train, we considered the prospect that practical challenges, such as resource constraints, might prevent the EPA Administrator from meeting a statutory deadline for publishing certain guidelines. 510 F.2d at 710-14. In light of those challenges, like the possibility that “budgetary" commitments and’ manpower” would render performance “beyond the agency’s capacity or would unduly jeopardize the implementation of other essential programs,”- we remarked that “courts cannot responsibly mandate flat guideline deadlines when the Administrator demonstrates that additional time- is necessary,” Id. at 712. “The sound discretion of an equity court,” we concluded, “does not embrace enforcement through contempt of a party’s duty to comply with an order that calls him ‘to do an impossibility.’” Id. at 713 (quoting Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948)). By extension, where a party insists that resource-constraints render lawful compliance with a court’s order impossible, an equity court must examine that claim and, prior to issuing the order, find that lawful compliance is indeed possible.
The District Court made no such finding. The Court also did not evaluate the Secretary’s assertion that the timetable would increase, not decrease, the number of backlogged appeals. The Secretary posited that because strict deadlines would require settlements en masse, the timetable would generate an incentive for claimants to file .additional appeals and hold out for big payouts. By. the Secretary’s account, the mandamus relief would prove counterproductive; the relief would exacerbate the risk of the Court’s order amounting to a command to do the impossible. The Court did not address this claim, perhaps because, as a counterfactual, such an assertion is difficult to test. But the claim was .plausible enough that, as a matter of crafting an equitable remedy, the Court should address it. -
On remand, the Court should determine in the first instance whether, in fact, lawful compliance with the timetable is impossible. We note, however, that the Secretary bears the “heavy burden to demonstrate the existence of an impossibility.” Ala. Power, 636 F.2d at 359 (discussing Train, 510 F.2d at 713). The burden serves to prevent an agency from shirking its duties by reason of mere difficulty or inconvenience. As we explained before, although “[a]n equity court can never exclude claims of inability to render absolute performance, ... it must scrutinize such claims carefully since officials may seize on a remedy made available for extreme illness and promote it into the daily bread of convenience.” Train, 510 F.2d at 713. Therefore, on remand, if the Court finds that the Secretary failed to carry his burden of demonstrating impossibility, it could potentially reissue the mandamus order *169 without modification. But given the Secretary’s claim of impossibility, the Court must make the predicate finding of possibility.
Our dissenting colleague believes such a finding is unnecessary, Dissenting Op. at 174-78, and amounts to a hypertechnical procedural .requirement for the District Court to “incant magic words,” id. at 171. But possibility is a necessary , and antecedent condition for the writ’s issuance, according to both our precedent and the collected wisdom of our sister courts. See, e.g., Newman, 42 App. D.C. at 420-21 (“The writ of mandamus will not issue to compel the performance of that which cannot be legally accomplished.” (emphasis added)); 52 Am. Jur. 2D § 24 (2017 Update) (“To warrant the issuance of a writ of mandamus, the act sought to be performed must be capable of being performed. Mandamus will not issue if the performance of the requested action is impossible,, or beyond the physical, mental, or financial power of the respondent.” (emphasis added)); 55 C.J.S. Mandamus § 19 (2017 Update) (“The writ of mandamus will not lie where performance of the duty is impossible. Thus, the court will not grant the writ unless the law afford the means by which the officer may .discharge the prescribed duty.” (emphasis added)); id. § 20 (“[A] public officer or public body will generally not be required to do an act when it is impossible through a want of funds and inability to raise them.”).
We are also not asking for a magic incantation. There is nothing mystical or punctilious about the judiciary giving due consideration to an executive agency’s central argument—made repeatedly and emphatically across three sets of'motions, not solely with allegations but with proffers'of evidence[3] -before issuing extraordinary relief with multi-billion-dollar stakes, Suppl. Decl. of Ellen Murray ¶ 6, J.A. 170 (amount-in-controversy for pending appeals is approximately $6.6 billion). Such a requirement is neither onerous nor trivial, and the interests of alacrity and expedition do not excuse its satisfaction. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 416, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (“That the court’s discretion is equitable in nature hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review.” (citation omitted)).
In sum, it was an abuse of discretion to tailor the mandamus relief without tackling the Secretary’s claims that lawful compliance, would be impossible. We emphasize, however, that the District' Court was assigned an exceptionally difficult project. The Secretary presented a flurry of *170 arguments as to what cannot be mandated, but a paucity of proposals regarding what can be. With little assistance from the party best positioned to furnish crucial information, the Court needed to craft workable relief while negotiating both the on-the-ground realities and the guidance offered in our past decision. An unenviable task.[4] Difficult as it was, however, courts must ensure that it is indeed possible to perform the act being commanded. Ought, after all, implies can.
⅝ ⅝ ⅜
For the foregoing reasons, we vacate the mandamus order and the order denying reconsideration, and remand to the District Court to evaluate the merits of the Secretary’s claim that lawful compliance would be impossible.

So ordered.

Dissenting Opinion filed by Circuit Judge HENDERSON.

. This principle-is attributed to the 18th century German philosopher, Immanuel 'Kant. See, e.g., Immanuel Kant, Critique of Pure Reason 548 (Norman Kemp Smith trans., Macmillan 1953) (1781) ("The action-to which the 'ought’ applies must indeed be possible under natural conditions.”); Immanuel Kant, Religion Within- the Limits.of Reason Alone 43 (Theodore M. Greene and Hoyt H, Hudson trans., Harper and Row 1960) (1793) ("[D]uty demands nothing of us which we cannot do.”).

. Fun fact: Even though we refer. to the "writ” of mandamus, both in past decisions and here, the writ was technically abolished. FED. R. CIV. P, 81(b). As a matter of convenience and habit, we continue to refer to the "writ” because the remedy continues to exist in character, if not in name. 28 U.S.C. § 1361 ("The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer ....” (emphasis added)); see also 33 Charles Alan Wright & Charles H. Koch, Ju„ Federal Practice & Procedure'§ 8299, at 41 (2006) ("Although [Rule 81] abolishe[d] the remedy formally known as mandamus, mandamus in character was not abolished by the rule change.”); id. at 42 ("[C]ou'rts in interpreting [§ 1361] brought over all the old mandamus restrictions and applied them in § 1361 actions.”). Consequently, when we refer to the "writ of mandamus” in this opinion, we mean the remedy provided for in 28 U.S.C. § 1361.

. See, e.g., Def.’s Mot. for Summ. J. at 23, No. 14-CV-851 (Nov. 7, 2016), ECF No. 41 (“It is telling that Plaintiffs are unable to identify a remedy that would not cause the Secretary to violate her other obligations under the Medicare statute.”); id. at 1, 7-8, 11-24; Def.’s Reply in Support of Summ. J. at 9, No, 14-cv-851 (Nov. 23, 2016), ECF No. 45-1 ("Plaintiffs' deadlines indeed would be impossible for the Secretary to meet absent augmentation of her resources and authorities, which only Congress can provide.”); id. at 1-2, 7-11; Def.'s Opp’n to Pis’ Mot. for Summ. J, at 1, 7-8, 11-24, No. 14-CV-851 (Nov. 7, 2016), ECF No., 42; Def.'s Mot. for. Recons, at 1, No. 14-cv-851 (Dec. 15, 2016), ECF No. 49 ("Specifically, the ruling errs in ordering scheduled percentage reductions in the Medicare appeals backlog that the Secretary cannot achieve unless she were to pay pending claims without regard to their merit, which would violate her statutory obligation to pro- ' tect the Medicare Trust Funds.”); id. at 2-3; Def.'s Reply in Support of Mot. for Reconsideration at 2, No. 14-CV-851 (Dec. 23, 2016), , ECF No. 51 ("And notably, Plaintiffs do not and cannot deny that it is impossible for the Secretary to comply with the benchmarks set forth in this Court’s [timetable] unless she offers settlements without regard to the merits of the claims .... ”).

. We note that if, despite his burden, the Secretary fails to offer information that would aid the crafting of mandamus relief, the Court has options. See, e.g., Fed. R. Civ. P. 56(e) (providing that courts may order parties to address facts or "issue any other appropriate order”); Fed. R. Civ. P. 53(a) (authorizing courts to appoint special masters).